

ENTERED
11/16/2012

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| FRANK MCDOWELL AND LORI | § | |
| MCDOWELL, | § | Case No. 12-31231-H4-7 |
| | § | (Chapter 7) |
| Debtors. | § | |
| | § | |

**MEMORANDUM OPINION REGARDING UNITED STATES TRUSTEE'S MOTION
TO COMPEL PRODUCTION OF DOCUMENTS CLAIMED AS PRIVILEGED BY
FRANK MCDOWELL AND LORI MCDOWELL**
[Relates to Docket No. 51]

## I. INTRODUCTION

At common law, attorney-client communications are protected from disclosure, with the

purpose of this privilege meant to "encourage full and frank communication . . . and thereby

promote [the] broader public interests in the observance of law and administration of justice."

*Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  Similarly, the "work-product doctrine"

is meant to "shelter[] the mental processes of the attorney, providing a privileged area within

which he can analyze and prepare his client's case." *United States v. Nobles*, 422 U.S. 225, 238

(1975).

These tenets, however, are at odds with another basic principle.  As the Fifth Circuit has

said, "[t]he duty of disclosure in a bankruptcy proceeding is a continuing one," *In re Coastal

Plains, Inc.*, 179 F.3d 197, 208 (5th Cir. 1999); *see also In re Ramirez*, No. 03-47872, 2006 WL

3838176, at *3 (Bankr. S.D. Tex. Dec. 29, 2006).  Debtors must divulge *all* relevant facts in

order to receive the full benefits and protections of the Bankruptcy Code,[1] with the broad policy and goals of the Code "favor[ing] transparency and disclosure whenever possible." *Coastal Plains, Inc.*, 179 F.3d at 208.

This Court has decided to issue this Memorandum Opinion in order to clarify the scope of the attorney-client privilege and the work-product doctrine regarding handwritten notes and comments made by debtors and their counsel on documents used to facilitate the filing of the petition, the Schedules and the statement of financial affairs (SOFA). The Court also issues this Opinion to emphasize the evidentiary requirements for establishing the attorney-client privilege and work-product doctrine. Debtor and counsel communications *may* be privileged, but the assertor of the privilege *must* prove each element in order to receive the privilege's protection.

At stake in the case at bar is the disclosure of the following documents: (1) a questionnaire (the Questionnaire), which is a document created by counsel for Frank McDowell and Lori McDowell (the Debtors) and which this counsel, in the regular course of representing consumer debtors, uses to assist in representation; (2) a copy of the original Schedule F with handwritten notes and comments by the Debtors (the Handwritten Debtors' Draft Schedule); and (3) a copy of the original Schedule F with comments by the Debtors' counsel (the Handwritten Counsel's Draft Schedule). The United States Trustee (the UST) has brought the Emergency Motion of United States Trustee to Compel Production (the Motion to Compel) to compel production of each of these documents.

Based upon the entire record, the Court now makes the following written Findings of Fact and Conclusions of Law.[2] The Court concludes that the Questionnaire is protected as an

---

[1] Any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code unless otherwise noted. Further, any reference to "the Bankruptcy Rules" refers to the Federal Rules of Bankruptcy Procedure.

attorney-client communication and as attorney work-product; the Handwritten Counsel's Draft Schedule is also protected as attorney work-product.  However, the Handwritten Debtors' Draft Schedule is not protected, as the Debtors have failed to meet their burden and did not adduce testimony or introduce exhibits demonstrating each required element.  The Motion to Compel should therefore be granted regarding the Handwritten Debtors' Draft Schedule and denied regarding the Questionnaire and the Handwritten Counsel's Draft Schedule.

## II. FINDINGS OF FACT

1. On February 15, 2012, the Debtors filed a Chapter 7 petition.  [Doc. No. 1].

2. On May 11, 2012, the UST filed a Motion to Dismiss Chapter 7 Case Pursuant to § 707(b)(3) of the Bankruptcy Code (the Motion to Dismiss).  [Doc. No. 20].

3. After the Debtors failed to file a response to the Motion to Dismiss, this Court signed an order dismissing the case.  The order was entered on the docket on June 6, 2012.  [Doc. No. 24].

4. On June 12, 2012, the Debtors filed an amended petition along with amended Schedules (Schedules A through J) and an amended SOFA.  [Doc. Nos. 26–28].

5. On June 18, 2012, the Debtors filed a Motion to Reconsider and Vacate the Order Dismissing Chapter 7 Case (the Motion to Reconsider), along with an amended Schedule I.  [Doc. Nos. 30 & 32].

6. On July 23, 2012, this Court signed an order which granted the Motion to Reconsider, vacated the order dismissing the case, and scheduled a hearing on the Motion to Dismiss.  [Doc. No. 43].

---

[2] To the extent that any Finding of Fact is construed to be a Conclusion of Law, it is adopted as such.  To the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such.  The Court reserves the right to make any additional Findings and Conclusions as may be necessary or as requested by any party.

7.  Additionally on July 23, 2012, in a letter to the Debtors' counsel, the UST—now knowing that there would be an evidentiary hearing on the Motion to Dismiss—requested that the Debtors produce the following documents:

> [C]opies of any and all documents, statements or reports provided to you or to your office by or on behalf of [the Debtors] . . . including but not limited to real and personal property records and credit reporting agencies, for the purpose of preparing Debtors' original and amended personal bankruptcy petition, schedules, statement of financial affairs, declarations, means test, and related declarations.

[Doc. No. 51, Exhibit A]. The UST also requested "for inspection the original client questionnaires and bankruptcy documents, including signature pages." [*Id.*].

8.  On July 31, 2012, the Debtors filed their response opposing the Motion to Dismiss. [Doc. No. 45].

9.  On August 30, 2012, counsel for the Debtors, in responding to the UST's letter of July 23, informed the UST that the Debtors would not produce the requested documents on the grounds of attorney-client and attorney work-product privileges. [Doc. No. 51, Exhibit B, at 2].

10. Counsel for the Debtors provided the UST with a privilege log (Debtors' Privilege Log) stating the following with respect to each document withheld:

| Description of Document | Claimed Privilege |
|---|---|
| Client Information Worksheet [previously defined herein as the Questionnaire] Utilized To Prepare Statements, Schedules and Statement Of Financial Affairs. Prepared prepetition by one or both of the Debtors and contains notes written by counsel for the Debtors during follow-up consultation and final preparation of Schedules. Exact Date of preparation is unknown, other than it was prepared prior to the filing of the Debtors' petition. | Attorney/Client Privilege Attorney Work Product |
| Copy of original Schedule F [defined previously herein as the Handwritten Debtors' | Attorney/Client Privilege |

| | |
|---|---|
| Draft Schedule] for case 12-31231 with hand written notes for most creditors and some comments on amounts.  Comments and notes written by one of the Debtors(s) at the request of the Debtors' counsel for the purpose of discussion.  The document was prepared approximately June 10, 2012. | |
| Copy of original Schedule F for case 12-31231 with hand written notes for each creditor [defined previously herein as the Handwritten Counsel's Draft Schedule].  Comments/notes were written by counsel for the Debtors during an in-office conference with the Debtors on June 8, 2012. | Attorney Work Product |

[Debtors' Privilege Log].

11. On September 6, 2012, the UST filed the Motion to Compel.  [Doc. No. 51].

12. On September 21, 2012, the Debtors, in opposing the Motion to Compel, filed their Brief Regarding Attorney-Client Privilege and Attorney Work Product.  [Doc. No. 55].

13. On September 26, 2012, the UST filed its Reply of United States Trustee to the Debtors' Brief Regarding Attorney-Client Privilege and Attorney Work Product.  [Doc. No. 56].

14. On September 27, 2012, this Court held a hearing on the Motion to Compel (the Hearing). Counsel for the UST, Ellen Hickman, and counsel for the Debtors, Johnie Patterson (Patterson) and Miriam Goott (Goott), appeared.  The Debtors, however, did not personally appear or testify.  *See* [Tape Recording, 09/27/12 Hearing at 2:34:11–3:09:04 p.m.].

15. At the Hearing, Patterson testified to the following:

   a. The first page of the Questionnaire is not a handout that Patterson's firm's debtors/clients take home.  [Debtors' Privilege Log, Bates No. 222].  Instead, it is completed at his firm's office where both the debtor and the attorney are present. Either the attorney fills in the first page of the Questionnaire himself when meeting with the client, or the first page of the Questionnaire is filled in by the client at the

firm's office while the client goes through the document with the lawyer.  [Tape

Recording, 09/27/12 Hearing at 2:39:20–2:39:53 p.m.].

b.  The remaining pages of the Questionnaire are not given to every client.  [Debtors'

Privilege Log, Bates Nos. 223–245].  As every client is different, each lawyer at

Patterson's firm uses the handout differently.  The pages of the Questionnaire are also

frequently updated and changed by lawyers at Patterson's firm over time, such that

different versions of the form are in use at any given time.  [Tape Recording,

09/27/12 Hearing at 2:39:53–2:40:45 p.m.].

c.  All of the information given by a client in the Questionnaire is in response to

questions drafted by attorneys at Patterson's firm.  The questions themselves are

written in a unique way—different from the questions in the official Schedules and

SOFA.  The Questionnaire's questions are meant to elicit full and more complete

information from the firm's debtors/clients than that required by the Schedules and

SOFA.  The questions are similar to questions the lawyer would ask if time permitted

asking such questions in person.[3]  [*Id.* at 2:40:54–2:42:00 p.m.].

d.  Each client's responses to the Questionnaire are given to counsel in confidence with

the expectation that the answers are for his/her lawyer only.  [*Id.*].

## III.  CREDIBILITY OF WITNESSES

---

[3] Although Patterson did not give any testimony on the issue of how much time it would take a lawyer at his firm to ask all of the questions on the Questionnaire (as opposed to having the client fill out the Questionnaire), the Court notes that Patterson's firm, like the vast majority of firms whose practice primarily involves representation of consumer debtors, has a voluminous client base.  Therefore, there is little doubt that if any attorney at Patterson's firm, instead of handing out the Questionnaire, orally asked the client all of the questions, substantial time would be consumed.

At the Hearing, only Patterson testified.  *See* [Finding of Fact Nos. 14–15].   His testimony was uncontroverted.  This Court finds Patterson to be very credible on all issues about which he testified, and gives considerable weight to his testimony.

## IV.   Conclusions of Law

### A.   Jurisdiction and Venue

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a).  This dispute is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) because it is a matter affecting the administration of the Chapter 7 estate.  Finally, this dispute is a core proceeding under the general "catch-all" language of 28 U.S.C. § 157(b)(2).  *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts),* Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that a matter may constitute a core proceeding under 28 U.S.C. § 157(b)(2) "even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance."). Venue is proper pursuant to 28 U.S.C. 1408(1).

### B.   Constitutional Authority to Enter a Final Order

No analysis under *Stern v. Marshall*, 131 S. Ct. 2594 (2011) needs to be conducted with respect to the Motion to Compel because any order which this Court signs regarding the Motion to Compel is not a final order that can be appealed.  *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100 (2009).

### C.   The Attorney-Client Privilege Protects the Questionnaire But Not the Handwritten Debtors' Draft Schedule.

    1.    <u>The Purpose of the Attorney-Client Privilege.</u>

"The attorney-client privilege, when applicable, shields from disclosure confidential communications between an attorney and client." *Alpert*, 267 F.R.D. at 208.  The purpose of the privilege is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn*, 449 U.S. at 389.  The privilege is premised on the attorney's need to "know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out." *Id.* (quoting *Trammel v. United States,* 445 U.S. 40, 51 (1980)).

Not all communications between a client and his or her attorney are protected by the attorney-client privilege.  *United States v. Pipkins,* 528 F.2d 559, 562–63 (5th Cir. 1976) (stating that the attorney-client privilege "is not a broad rule of law which interposes a blanket ban on the testimony of an attorney.").  As evidenced by the Fifth Circuit's definition of attorney-client privileged communications, "[w]hile the attorney-client privilege extends to all situations in which counsel is sought on a legal matter, it protects 'only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege.'" *Navigant Consulting, Inc. v. Wilkinson,* 220 F.R.D. 467, 473 (N.D. Tex. 2004) (quoting *Fisher v. United States,* 425 U.S. 391 (1976)).  The attorney-client privilege will therefore not attach to *every* communication between a client and his/her attorney, as the privilege "does not embrace everything that arises out of the existence of an attorney-client relationship." *Pipkins,* 528 F.2d at 563; *see also United States v. Johnson,* 465 F.2d 793, 795 (5th Cir. 1972) ("[N]ot all documents in the hands of an attorney fall within the privilege."); *AHF Cmty. Dev., LLC v. City of Dallas,* 258 F.R.D. 143, 146 (N.D. Tex. 2009) ("[T]he mere existence of an attorney-client privilege relationship or the mere exchange of information with an attorney does not give rise to a

presumptive claim of privilege." (quoting *Varo, Inc. v. Litton Sys., Inc.,* 129 F.R.D. 139, 142 (N.D. Tex. 1989))).

    2.    <u>The Fifth Circuit's Definition of Attorney-Client Privilege.</u>

Applying these principles, the Fifth Circuit has defined attorney-client privileged communications as: (1) communications made to a lawyer; (2) for the primary purpose of securing either a legal opinion or legal services, or assistance in some legal proceeding; and (3) with the intent to remain confidential. *United States v. Robinson,* 121 F.3d 971, 974, 976 (5th Cir. 1997); *Pipkins,* 528 F.2d at 562; *Alpert,* 267 F.R.D. at 208. A more detailed definition was outlined in *United States v. Kelly,* where the Fifth Circuit noted the same three general requirements, as well as two exceptions. 569 F.2d 928, 938 (5th Cir. 1978) (quoting *United States v. United Shoe Machinery Corp.,* 89 F. Supp. 357, 358–59 (D. Mass. 1950)). As the *Kelly* court found, a communication that is otherwise protected under the *Robinson* test is not privileged if: (1) it was made for the purpose of committing a crime or fraud[4]; or (2) the privilege was waived by the privilege-holder. *Id.*

The party invoking the privilege bears the burden of proving that his or her communications are privileged and, therefore, protected from disclosure. *In re Santa Fe Int'l Corp.,* 272 F.3d 705, 710 (5th Cir. 2001) ("A party asserting a privilege exemption from discovery bears the burden of demonstrating its applicability."); *Hodges, Grant & Kaufmann v. U.S. Gov't, Dept. of the Treasury, IRS,* 768 F.2d 719, 721 (5th Cir. 1985) ("The burden of demonstrating the applicability of the privilege rests on the party who invokes it.").

---

[4] The *Kelly* court refers to the first exception as a communication made for the purpose of committing a "crime or tort." *Kelly,* 569 F.2d at 938. However, most courts refer to this exception as the "crime-fraud" exception. *See, e.g., Swidler & Berlin v. United States,* 524 U.S. 399, 409 (1998) (comparing the extension of the attorney-client privilege posthumously to the crime-fraud exception); *United States v. Zolin,* 491 U.S. 554, 565 (1989) (discussing *in camera* review to determine whether communications fall within the crime-fraud exception); *United States v. Neal,* 27 F.3d 1035, 1048 (5th Cir. 1994) (recognizing the crime-fraud exception and upholding the trial court's allowance of testimony by the Defendants' attorney).

3.     Application of the Fifth Circuit's Test to this Dispute.

In this dispute, the Debtors have asserted the attorney-client privilege. [Debtors' Privilege Log, Bates Nos. 213–218, 222–245]. The Debtors assert that they communicated with their bankruptcy attorneys (i.e., Patterson and Goott) for the purpose of obtaining legal advice during follow up consultations and final preparation of the Schedules for filing. [Debtors' Privilege Log]; [Finding of Fact No. 10]; *see also In re Wilkerson*, 393 B.R. 734, 741 (Bankr. D. Colo. 2007) (finding that "the consultation regarding[] preparation and filing of the Debtor's voluntary petition, [SOFA] and schedules" was sufficient to prove the first elements of the attorney-client privilege). Accordingly, it is the Debtors' burden to prove the applicability of the privilege. *Robinson*, 121 F.3d at 974; *Hodges, Grant & Kaufmann*, 768 F.2d at 721; *United States v. El Paso Co.*, 682 F.2d 530, 538 (5th Cir. 1982); *Pipkins*, 528 F.2d at 563 (finding that the defendant failed to establish confidentiality); *Zelaya v. Unicco Serv. Co.*, 682 F. Supp. 2d 28, 38 (D.D.C. 2010) (holding the claimant must provide competent evidence that supports each of the essential elements necessary to sustain a claim of privilege); *In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 255 (Bankr. S.D.N.Y. 2005) ("The person asserting the privilege has the burden of proving the communication is privileged, and that the privilege was not waived.") (citation omitted).

The Debtors must also prove that the attorney-client privilege applies to each communication they are claiming as privileged. *El Paso Co.*, 682 F.2d at 539 ("The privilege must be specifically asserted with respect to particular documents."). Blanket and conclusory assertions of privilege do not satisfy a claimant's burden. *See id.* at 541 (claimant did not satisfy its burden where it "failed to particularize its assertion of the privilege and prove its case with respect to any specific document."); *SEC v. Microtune*, 258 F.R.D. 310, 315 (N.D. Tex. 2009)

("[T]he privilege does not protect documents and other communications simply because they result from an attorney-client relationship."). Rather, because the privilege hinders discovery and stands in "derogation of the public's right to every man's evidence, and as an obstacle to the investigation of truth," *Pipkins,* 528 F.2d at 563 (citations omitted) (internal quotation marks omitted), courts narrowly construe a claim of attorney-client privilege.

In the case at bar, the Debtors assert that the attorney-client privilege attaches to two communications: (1) the Questionnaire; and (2) the Handwritten Debtors' Draft Schedule. [Debtors' Privilege Log, Bates Nos. 213–218, 222–245]. The Court now discusses whether the Debtors have proven all of the necessary elements to be able to invoke the privilege and thereby avoid having to produce these two documents.

### a. Element #1: The Evidence Shows That the Communications at Issue Were Made by the Clients to their Attorney.

Both the Questionnaire and the Handwritten Debtors' Draft Schedule were written communications made by the Debtors to their counsel, thereby satisfying the first element. Indeed, the Debtors' Privilege Log includes the following description of the Questionnaire[5]:

> Client Information Worksheet Utilized To Prepare Statements, Schedules and Statement Of Financial Affairs. Prepared prepetition by one or both of the Debtors and contains notes written by counsel for the Debtors during follow-up consultation and final preparation of Schedules. Exact date of preparation is unknown, other than it was prepared prior to the filing of the Debtors' petition.

[Finding of Fact No. 10]. As Patterson testified, this document is used by the lawyer; it is either filled in by counsel when meeting with the client, or is filled in by the client in counsel's office

---

[5] In this case, the Debtors produced a sufficient Debtors' Privilege Log, complying with the requirements discussed in *In re Royce Homes, LP,* 449 B.R. 709, 729–30 (Bankr. S.D. Tex. 2011) ("Speer's privilege log is grossly deficient in that it did not adequately describe how each document meets the definition of an attorney-client privileged communication. The log is riddled with bald assertions of the privilege . . . . 'A proper claim of privilege requires a specific designation and description of the documents within its scope as well as precise and certain reasons for preserving their confidentiality.'" (quoting *Greene, Tweed of Delaware, Inc. v. DuPont Elastomers, L.L.C.,* 202 F.R.D. 418, 423 (E.D. Pa. 2001))).

in the presence of counsel. [Finding of Fact No. 15]. Not all of the pages of the Questionnaire are relevant to every client; therefore, the information given on the Questionnaire is controlled by the very questions which counsel has devised. [*Id.*]. These questions are specifically tailored to the client's issues. [*Id.*]. Accordingly, the Court finds that the information provided in the Questionnaire was communicated by the Debtors to their attorney.

The Handwritten Debtors' Draft Schedule was similarly a communication made by the Debtors to their attorney. The Debtors' Privilege Log describes this communication as follows:

> Copy of original Schedule F for case 12-31231 with hand written notes for most creditors and some comments on amounts. Comments and notes written by one of the Debtors. The document was "marked up" by the Debtor(s) at the request of the Debtor's counsel for the purpose of discussion. The document was prepared approximately June 10, 2012.

[Finding of Fact No. 10]. As the description states, this document was prepared by the Debtors to communicate "comments," "amounts," and "notes" to their counsel. [*Id.*]. As a result, the Handwritten Debtors' Draft Schedule is also a communication made to counsel.

     **b.**     **Element #2: The Evidence Shows That the Questionnaire Was Used for the Purpose of Securing Legal Advice, but the Evidence Does Not Show That the Handwritten Debtors' Draft Schedule Was Used for the Purpose of Securing Legal Advice.**

The next element of attorney-client privilege is that the communications at issue must be made for the purpose of securing legal advice. *Robinson*, 121 F.3d at 974. The surrounding events are instructive to establishing this element. Here, the Debtors do not remember the Questionnaire's date of completion [Debtors' Privilege Log], except that the Debtors and their counsel completed it prior to filing their Chapter 7 petition on February 15, 2012. [Finding of Fact No. 1].

This timeline alone is not sufficient to establish the Questionnaire's purpose. At the Hearing, however, the UST asked Patterson the following question: "I am just wondering if this

questionnaire that . . . was prepared by the Walker & Patterson law firm is the same questionnaire that is provided to any client that would come in and contemplate filing bankruptcy, either Chapter 7 or 13." [Tape Recording, 09/27/2012 Hearing at 2:38:42–2:39:08 p.m.]. In response, Patterson testified to the following:

> No. . . . the information that[ is] given is provided in response to our questions that are contained in the questionnaire[. It is] given back in confidence by our clients to us with that expectation that it is [sic] answers for their lawyer only; it's information given to their lawyer and that's because [of] the unique way in which we drafted the document, the questions are written by the lawyers in a way that we try to elicit, I guess, fuller information, more complete information . . . .

[*Id.* at 2:39:09–2:41:34 p.m.].[6]  Patterson's testimony confirmed that the Debtors completed the Questionnaire in anticipation of their forthcoming bankruptcy filing. [*Id.*]; [Finding of Fact No. 15]. As a result, this Court concludes that the Questionnaire was completed for this purpose.

Similarly, the Privilege Log asserts that the Debtors used the Handwritten Debtors' Draft Schedule for the purpose of securing legal advice. [*Id.*] ("The document was 'marked up' by the Debtor(s) at the request of the Debtors' counsel for the purpose of discussion."). The Handwritten Debtors' Draft Schedule was completed on June 10, 2012, two days before the Debtors filed their amended Schedules (i.e., June 12, 2012), including an amended Schedule F. [Finding of Fact Nos. 4 & 10]. Thus, *presumably*, the Debtors' mark ups to the Handwritten Debtors' Draft Schedule—made before the amendments were actually filed with this Court— were for the purpose of securing legal advice to file the actual amended Schedules.

However, at the Hearing, the Debtors failed to adduce *any* testimony and failed to introduce *any* exhibits which would support this inference. Patterson, the only witness to testify, did not discuss the Handwritten Debtors' Draft Schedule. *See* [Finding of Fact No. 15] (discussing the Questionnaire alone). As a result, this Court cannot conclude that the

---

[6] The Court construes Patterson's answer to mean, among other things, that the Debtors in the pending case completed the Questionnaire in anticipation of filing their Chapter 7 petition.

Handwritten Debtors' Draft Schedule was made for the purpose of securing legal advice; the Debtors have failed to meet their burden.

Moreover, with respect to the Handwritten Debtors' Draft Schedule, even if this Court finds that the Debtors' burden is met by the assertions in the Privilege Log, the Debtors have nonetheless failed to establish the third element, as discussed below.

> c. **Element #3: The Questionnaire was Communicated With an Expectation of Confidentiality But the Handwritten Debtors' Draft Schedule was Not Intended to be Confidential.**

> i. *Definition of Confidentiality.*

Confidentiality is vital to a claim of attorney-client privilege, as it is the essence of the privilege. *Robinson*, 121 F.3d at 976; *Indus. Clearinghouse, Inc. v. Browning Mfg. Div. of Emerson Elect. Co.*, 953 F.2d 1004, 1007 (5th Cir. 1992) ("The privilege protects only confidential communications of the client to the attorney."); *Pipkins*, 528 F.2d at 563.   A confidential communication in this context is generally defined as a communication not intended to be disclosed to third parties other than parties reasonably necessary for the transmission of the message or those to whom disclosure furthers the rendition of legal services.   3 WEINSTEIN'S FEDERAL EVIDENCE, § 503.15[1] (2010).   The circumstances surrounding the communication provide evidence of whether the party asserting the privilege intended for his or her communications to be and to remain confidential. *See Robinson*, 121 F.3d at 976.   Specifically, the evidence must show that a party made the communication in confidence and maintained that communication's confidentiality. *Garner v. Wolfinbarger*, 430 F.2d 1093, 1100 (5th Cir. 1970) (Two "fundamental" conditions of the attorney-client privilege are: "(1) The communications must originate in a confidence that they will not be disclosed"; and (2) "This element of confidentiality must be essential to the full and satisfactory maintenance of the relation between

the parties." (quoting 8 J. WIGMORE, EVIDENCE § 2285 at 527 (2010))); *see also Pipkins*, 528 F.2d at 563 ("[C]ourts have refused to apply the privilege to information that the client intends his attorney to impart to others . . . or to communications made in the presence of third parties.").

In order to satisfy the Fifth Circuit's definition of a confidential communication, the party invoking the attorney-client privilege must have had a reasonable expectation of confidentiality or privacy. *Robinson*, 121 F.3d at 976.   *Robinson*, in fact, creates a two-part test for this expectation.   "The assertor of the privilege must have a reasonable expectation of confidentiality, either that [(1)] the information disclosed is *intrinsically confidential*[;] or [(2)] by showing that he had a *subjective intent* of confidentiality."  *Id.* (citing *United States v. Melvin*, 650 F.2d 641, 646–47 (5th Cir. Unit B 1981)) (emphasis added).

> ii.   *Tension Between the Right to Confidentiality Versus the Need to Disclose in Bankruptcy.*

In bankruptcy, the expectation of confidentiality is diminished, with debtors—unlike other civil litigants—continually and affirmatively required to disclose all of the following: (a) a list of creditors; (b) a schedule of assets, liabilities, current income, and current expenditures; and (c) a statement of financial affairs.   *In re Henley*, No. 11-33438, 2012 WL 4856732, at *43 (Bankr. S.D. Tex. Sept. 28, 2012) (citing *In re Gartner*, 326 B.R. 357, 367 (Bankr. S.D. Tex. 2005)).   These records must be reliable and complete.  *Gartner*, 326 B.R. at 367.   And, because debtors know that the information contained in the documents will in fact be made public upon filing, some courts have implied that information disclosed to an attorney relating to the specific documents is *never* "intrinsically confidential."   *Robinson*, 121 F.3d at 976.   Other courts, however, disagree.   The Court now reviews these cases in order to arrive at a decision in the case at bar.

iii.  *One Line of Cases Suggests There is No Attorney-Client Privilege in the Bankruptcy Context.*

Some courts have suggested that *Robinson*'s "subjective intent" test is irrelevant in bankruptcy.  *Id.*  For example, one line of cases—based on the Seventh Circuit's decision in *United States v. White*—asserts that "when information is disclosed for the purpose of assembly into a bankruptcy petition and supporting schedules, there is *no* intent for the information to be held in confidence because the information is to be disclosed on documents publicly filed with the bankruptcy court."  950 F.2d 426, 430 (7th Cir. 1991) (emphasis added); *Wilkerson*, 393 B.R. at 742–43; *In re French*, 162 B.R. 541, 548 (Bankr. D.S.D. 1994).

In *White*, the Seventh Circuit therefore created a seemingly bright-line rule: a debtor can have *no* expectation of confidentiality in information disclosed for the purpose of assembly into a bankruptcy petition.  950 F.2d at 430.  Because the information provided to counsel—even in confidence—will be subsequently disclosed on publicly-filed documents, the apparent conclusion is that these communications are not protected by the attorney-client privilege.  *Id.* (citing *In re Feldberg*, 862 F.2d 622, 628 (7th Cir. 1988) ("Information imparted to counsel without any expectation of confidentiality is not privileged.")).  Stated differently, the conclusion is that the debtor's intent to keep this information confidential is simply not reasonable.

This rule, however, was not actually the *White* court's holding.  Instead, the Seventh Circuit actually held that the debtor made an insufficient blanket assertion of the privilege; there, the debtor did not articulate with sufficient clarity those communications for which he had an expectation of confidentiality.  *Id.* at 430–31.  This failure to particularize decided the issue, and the Seventh Circuit's remaining discussion of the attorney-client privilege was dicta.  This rule, therefore, does not govern the outcome of the dispute at bar.  *See Central Va. Cmty. College v. Katz*, 546 U.S. 356, 363 (2006) ("[W]e are not bound to follow our dicta in a prior case in which

the point now at issue was not fully debated."); *Wainwright v. Witt*, 469 U.S. 412, 422 (1985) (distinguishing dicta and holding in prior case); *id.* at 436 n.1 (Stevens, J., concurring in the judgment) ("I do agree with the Court's observation that dictum is not binding in future cases."). Indeed, even if this bright-line rule was the holding in *White*, this Court is bound only by Fifth Circuit precedent, not Seventh Circuit precedent. *See Harper v. Bowen*, 813 F.2d 737, 742 (5th Cir. 1987) ("[W]e are not bound by other circuit courts' decisions . . . ."); *Webber v. Tamez*, No. 4:10-CV-511-Y, 2011 U.S. Dist. LEXIS 27399, at *6 (N.D. Tex. Feb. 22, 2011) ("This court is not bound by other circuit case law that holds otherwise.").

Additionally, the *White* court's bright-line dicta rule leaves open an important area of privilege. The rule states that "[w]hen information is disclosed for the purpose of assembly into a bankruptcy petition and supporting schedules there is no intent for the information to be held in confidence . . . ." *White*, 950 F.2d at 430. This language implies that communications made for a purpose beyond the "assembly" of a debtor's schedules and SOFA could be protected.

Webster's Dictionary defines "assemble" as "to bring together (as in a particular place or for a particular purpose); to fit together the parts of." MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY 1074 (10th ed. 2001). The *White* court's use of the word "assembly" therefore seems to assume that the job of the bankruptcy attorney in preparing the bankruptcy petition, the Schedules and the SOFA is one of simply bringing together pre-determined parts. Accordingly, assembly is not a task requiring expertise; and therefore—so the Seventh Circuit's reasoning goes—communications made to complete this task are unprotected because they could have been made to anyone capable of filling out a debtor's Schedules and SOFA.

This conclusion exhibits a fundamental lack of understanding about the bankruptcy process. As Patterson aptly noted while testifying, debtors hire bankruptcy lawyers because of

their expertise in bankruptcy law. *See* [Tape Recording, 09/27/2012 Hearing at 3:00:00–3:03:00 p.m.] (discussing the difference between a bankruptcy attorney and a bankruptcy petition preparer). Bankruptcy attorneys are not just Section 110 "bankruptcy petition preparer[s]." *See* 11 U.S.C. § 110 (defining "bankruptcy petition preparer" and the penalty for said preparer's negligence or fraudulence in preparing a bankruptcy petition). Bankruptcy petition preparers are by definition *not* attorneys; they do not "practice law or give legal advice." 11 U.S.C. § 110(b)(2)(B)(i). Bankruptcy attorneys, on the other hand, may aid a client in completing a petition, the Schedules, and the SOFA by using the attorney's expertise in bankruptcy law to give legal advice. For instance, with respect to properly completing Schedules, an attorney may offer expertise by explaining how to maximize exemptions under applicable law or by reviewing the definition of "value". *See, e.g., Thompson v. Powell*, 413 F.2d 276, 277 (5th Cir. 1969) (allowing the debtors to amend their Schedules because they originally misunderstood the definition of "exempt property"); *In re Walsh*, 5 B.R. 239, 241 (Bankr. D.D.C. 1980) (conducting a lengthy analysis of the terms "value" and "fair market value," and noting that "[t]he definition[s] [are] not invariable, but var[y] with the circumstances surrounding a given object and situation to which it is sought to apply the term.") (citation omitted) (internal quotation marks omitted). As another example, an attorney may offer expertise by explaining the differences between a business debt and a personal debt. *See In re Booth*, 858 F.2d 1051, 1055 (5th Cir. 1988) ("[T]he test for determining whether a debt should be classified as a business debt, rather than a debt acquired for personal, family or household purposes, is whether it was incurred with an eye toward profit.").[7]

---

[7] Indeed, in the case at bar, one of the issues raised by the UST is that it is necessary to determine whether the debts of the Debtors are consumer or business. [Doc. No. 51 at 5, ¶ 15].

An attorney is therefore not required to merely transpose the debtor's words onto the Schedules and SOFA, and the debtor's communications may well include more in his/her responses than is required for assembly. Thus, even under the *White* bright-line dicta rule, communications from debtor to counsel may—at least in certain circumstances—be protected by the attorney client privilege.

Quoting *White*, the court in *Wilkerson* articulated a similar bright-line rule: "information provided to the [b]ankruptcy [a]ttorney for the purpose of completing the bankruptcy schedules [and SOFA and petition] is *not* privileged" because it was not "provided under circumstances giving rise to a reasonable expectation of confidentiality." *Wilkerson*, 393 B.R. at 742–43 (emphasis added). Yet, like *White*, *Wilkerson* also implied that information disclosed for another purpose, such as obtaining legal advice and counsel, could reasonably be expected to remain confidential. *Id.* at 743. For example, the *Wilkerson* court found that "handwritten comments and questions that appear[ed] on [the debtor's] draft schedules" were protected. *Id.* The notes reflected "respons[es] to information provided by the [d]ebtor and communicated to the [d]ebtor in confidence." *Id.* Consequently, the *Wilkerson* court suggested that these sort of handwritten notes are not solely for "assembly," and may be protected by the attorney-client privilege.

      iv.     *At Least One Court Suggests that the Attorney-Client Privilege is Broader than the* White *Line of Cases.*

*In re Stoutamire*, 201 B.R. 592, 596 (Bankr. S.D. Ga. 1996), went beyond *White* and *Wilkerson* and created broader protection of attorney-client communications in the context of completing the Schedules and SOFA. While *White* and *Wilkerson* implied possible attorney-client privilege protection of communications made to counsel which go beyond the mere revealing of information for assembly of bankruptcy documents, the *Stoutamire* court found the following:

> [T]he communications which [the debtor] intends to protect by asserting the attorney-client privilege go beyond the mere revealing of information which would ultimately end up as a public disclosure. The information sought here deals with the conversations and communications between lawyer and client with respect to intake interview questions. While the responses elicited from that questionnaire will be used to prepare the schedules, *all of the information contained therein may or may not ultimately be disclosed publicly in such schedules*. The legal decision regarding whether or not certain information obtained in the intake interview should be included in the schedules and the conversations that occurred in gathering that information are necessarily protected. Accordingly, this Court concludes that the attorney-client privilege has been properly asserted by [the debtor].

*Id.* (emphasis added). Thus, the court found that the debtor had a reasonable expectation of confidentiality with respect to *all* conversations and communications between him and his bankruptcy attorney. *Id.* This expectation incorporated responses made to intake interview questions—including those which mirrored the questions in the Official Form Petition, Schedules and SOFA. *Id.* Consequently, under *Stoutamire*, any communication between the client and his/her bankruptcy attorney regarding completion of the Schedules and SOFA is protected by the attorney-client privilege.

v.    *Application of* Stoutamire*'s Reasoning to this Dispute.*

This Court rejects the bright-line dicta rule of *White* stating that when information is disclosed for the purpose of assembly into a bankruptcy petition, the Schedules, and the SOFA there is no intent for the information to be held in confidence. As *Booth*, *Thompson*, and *Walsh* show, debtors' attorneys reflect upon and analyze information given to them *by their debtor-clients* in order to provide counsel to them as to how to properly respond to various questions in the Schedules and the SOFA. *In re Booth*, 858 F.2d at 1055; *Thompson,* 413 F.2d at 277; *In re Walsh*, 5 B.R. at 241. As the *Stoutamire* court noted, it is a *legal decision* that a debtor's attorney makes as to what information will ultimately be disclosed publicly in the Schedules and the SOFA. 201 B.R. at 596. Accordingly, this Court adopts the reasoning of *Stoutamire* in

holding that the attorney-client privilege *may* attach to intake interview communications, intake questionnaires, and draft bankruptcy schedules.

To the extent that *Stoutamire* suggests that the attorney-client privilege *automatically* attaches to these documents and communications, however, this Court rejects *Stoutamire*. Stated differently, to the extent that *Stoutamire* suggests that these documents and communications would automatically be considered—to use the Fifth Circuit's words in *Robinson*—"intrinsically confidential," this Court disagrees. *Robinson*, 121 F.3d at 976.

On the other hand, to the extent that *Stoutamire* suggests that the attorney-client privilege attaches to documents and communications that the debtor-client intends to remain private, this Court agrees. Indeed, pursuant to the Fifth Circuit's holding in *Robinson*, the debtor must show that he has a subjective intent to keep these documents and communications confidential. *Id.*

Applying these principles to the case at bar, whether the communications and documents in dispute are, in fact, protected turns on the Debtors' subjective intent. *See id.* If the Debtors did not intend their communications to be confidential, then the Questionnaire and the Handwritten Debtors' Draft Schedule are not protected by the attorney-client privilege, and the Debtors must produce these documents in unredacted form to the UST.

(1)     The Debtors Demonstrated their Intent to Keep the Questionnaire Confidential.

At the Hearing, Patterson testified that the Debtors intended to complete the Questionnaire communications in confidence. [8] [Finding of Fact No. 15]; [Tape Recording, 09/27/2012 Hearing at 2:40:54–2:42:00 p.m.]. Thus, the Debtors' responses in the Questionnaire

---

[8] The Debtors themselves did not testify as to what their intent was. Rather, Patterson testified about their intent. While his testimony about their intent is hearsay, the UST did not object to this testimony. This testimony, therefore, is part of the record upon which this Court bases its decision.

were not meant to be discoverable.  This testimony is sufficient to establish the Debtors' intent

and satisfy their burden.

(2)    The Debtors Did Not Demonstrate Their Intent to Keep the
Handwritten Debtors' Draft Schedule Confidential.

Conversely, the Debtors have not shown that they made notes on the Handwritten

Debtors' Draft Schedule with a similar expectation of confidentiality.  The Debtors themselves

did not testify and Patterson's testimony did not address this document at all.  *See* [Tape

Recording, 09/27/12 Hearing at 2:35:18–2:42:01 p.m.].  In fact, the Debtors failed to introduce

any testimony or exhibits evidencing their subjective intent to keep this particular document

confidential.  As a result, the Debtors have failed to establish that they completed the

Handwritten Debtors' Draft Schedule in confidence.  Therefore, the Debtors are required to

produce this document, without redactions, to the UST.

**d.    Though Privileged, the Court Can Still Compel Production of the
Questionnaire if the Crime-Fraud Exception or Waiver is Established.**

Even if a communication is otherwise privileged, it may still fall outside the attorney-

client privilege protection if (1) the privilege-holder made the communication for the purpose of

committing a crime or fraud; or (2) the privilege-holder waived the privilege's protection.  *Kelly*,

569 F.2d at 938.  Because this Court has concluded that the Debtors have satisfied their burden

in establishing that the Questionnaire is protected by the attorney-client privilege, the only way

that the UST can obtain production of the Questionnaire is if one of these two exceptions exists.

i.    *The UST Has Failed to Establish a Prima Facie Case of Crime or
Fraud.*

Justice Cardozo wrote in 1932 that "[t]he [attorney-client] privilege takes flight if the

relation is abused.  A client who consults an attorney for advice that will serve him in the

commission of a fraud will have no help from the law."  *Clark v. United States*, 289 U.S. 1, 15

(1933). "While the burden is on the one asserting a privilege to show that a communication is

privileged, the burden shifts under the crime-fraud exception to the one seeking to pierce or

overcome the privilege." *United States v. Naegele*, 468 F. Supp. 2d 165, 174 (D.C.C. 2007).[9]

Once a prima facie case for crime or fraud is made, "the proper reach of the crime-fraud

exception when applicable . . . is limited to those communications and documents in furtherance

of the contemplated or ongoing criminal or fraudulent conduct." *In re Grand Jury Subpoena*,

419 F.3d 329, 343 (5th Cir. 2005).

In the case at bar, the UST's assertions are insufficient to establish this prima facie

requirement. At the hearing, the UST claimed that she needed the Questionnaire to establish the

reason for changes in the Debtors' Schedules. She argued as follows:

> The authorities that Mr. Patterson and [Ms.] Goott have quoted basically
> are saying that only in the event of fraud and crime would we be entitled to get
> this information. The US Trustee is under a duty, statutory duty, to investigate
> many matters including fraud and crime but also whether a debtor presumption of
> abuse arises, not in this case but whether a debtor because of not making full
> disclosure in the totality of the circumstances should not be granted a discharge
> and we've been unable to really determine why there wasn't full disclosure in this
> case.
> And the original schedules are very different from the amended schedules
> and we're trying to figure out why. And this questionnaire is important to us in
> order to determine who's at fault in this matter. Did the debtors not disclose
> information to their attorneys and that's why it didn't make it to the original
> schedules? Or was there some breakdown between what the debtors told their
> attorneys or provided to them in the way of assets and liabilities that somehow
> didn't—were not reflected on the original schedules?

[Tape Recording, 09/27/12 Hearing at 2:45:30–2:47:03 p.m.].

Bare suspicions of fraud or criminal conduct, however, are not sufficient to establish the

prima facie case. The UST has not presented any evidence to suggest that "the attorney-client

---

[9] *See also United States v. Bauer*, 132 F.3d 504, 509 (9th Cir. 1997) ("To invoke the crime-fraud exception
successfully, the government has the burden of making a prima facie showing that the communications were in
furtherance of an intended or present illegality and that there is some relationship between the communications and
the illegality.") (quoting *United States v. Chen*, 99 F.3d 1495, 1503 (9th Cir. 1996)).

relationship was used to promote an intended criminal activity . . . ." *United States v. Ballard*, 779 F.2d 287, 292 (5th Cir. 1986).  The UST implied at the Hearing that she simply could not establish a crime or fraud without the Questionnaire.  Yet, while the Questionnaire may have relevant evidence to a crime or fraud charge, the UST failed to present any evidence at the Hearing to support her suspicions.  Accordingly, the UST has not met her burden, and the crime or fraud exception to the attorney-client privilege does not apply to the Questionnaire.

        ii.    *The Debtors Have Established that They Did Not Waive the Attorney-Client Privilege.*

Finally, to retain the character of attorney-client privileged communications, the privilege cannot be waived.  *In re Grand Jury Proceedings*, 517 F.2d 666, 670 (5th Cir. 1975).  Whether the claimant has waived the privilege is a fact-specific inquiry and courts look at the events surrounding the alleged waiver.  *Alpert*, 267 F.R.D. at 209 ("Waiver is a fact-specific question that should be assessed on a case-by-case basis." (citing *Alldread v. City of Grenada*, 988 F.2d 1425, 1434 (5th Cir. 1993))); *see also Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165, 170 (2d Cir. 2003) (finding that the attorney-client privilege waived when client authorized law firm to send attorney-client communications to the SEC); *United States v. Mass. Inst. of Tech.*, 129 F.3d 681, 684–87 (1st Cir. 1997) (attorney-client privilege was waived when a government contractor produced documents to the Defense Department's audit agency).  The assertor of the privilege has the burden of proving that the privilege was not waived, and under federal common law, a party can waive the attorney-client privilege in two ways—by voluntarily disclosing privileged communications or by inadvertently disclosing those communications to third parties.  *Alldread*, 988 F.2d at 1434; *AHF Cmty. Dev.*, 258 F.R.D. at 148–49.

In determining whether disclosure was voluntary, for example, courts ask whether a party intended to provide third parties access to his or her confidential attorney-client communications.

*See Alpert*, 267 F.R.D. at 210 (concluding that there was no evidence that defendant "intended" to make information on a computer available to third parties).   Moreover, "any voluntary disclosure inconsistent with the confidential nature of the attorney[-]client relationship waives the privilege." *Hartford Fire Ins. Co. v. Garvey*, 109 F.R.D. 323, 327 (N.D. Cal. 1985).   In the bankruptcy context, voluntary waiver has been found where a debtor relies on advice of counsel as a defense or where the debtor has expressly disclosed what his counsel communicated to him. *See In re Myers*, 382 B.R. 304, 307 (Bankr. S.D. Miss. 2008) (holding that the debtor waived the attorney-client privilege when the debtor pled reliance on his attorney's advice during a deposition); *Wilkerson*, 393 B.R. at 746–47 (concluding that the debtor impliedly waived the attorney-client privilege by placing confidential information disclosed to her counsel at issue when asserting that she fully informed her attorney and omission of certain information was inadvertent); *French*, 162 B.R. at 548 (finding that debtor waived the attorney-client privilege by disclosing a substantial portion of the communication at the debtor's own Rule 2004 examination).

Inadvertent disclosure, on the other hand, generally refers to instances where a privilege-holder unintentionally or involuntarily discloses privileged communications to an opposing party during discovery. *Alpert,* 267 at 209–10.   Under such circumstances, courts rely on Rule 502 of the Federal Rules of Evidence to determine whether inadvertent disclosure operates as a waiver. *Id.*   Under this Rule, inadvertent disclosure does not waive the attorney-client privilege, but only if (1) the holder of the privilege took reasonable steps to prevent disclosure; and (2) the holder of the privilege took reasonable steps to correct a disclosure made erroneously. *Asia Global*, 322 B.R. at 255.

In the case at bar, the Debtors have demonstrated that they did not voluntarily waive the Questionnaire's attorney-client privilege. Indeed, at the Hearing, the Debtors did not even testify; thus, there is no evidence that the Debtors themselves asserted an "advice-of-counsel" defense in this hearing or that they expressly disclosed any communications that their attorneys have made to them. *See* [Tape Recording, 09/27/12 Hearing at 2:34:11–3:09:32 p.m.]. Nor does the UST so argue.

Rather, at the Hearing, the UST argued that "even if the court should find that [the Questionnaire] is confidential, we believe that the attorney client privilege has been waived because of the major amendments that this debtor filed when they filed the amended schedules because they are materially different from the original schedules." [*Id.* at 2:47:53–2:48:20 p.m.]. The UST contends that by the mere filing of the amended Schedules, the Debtors *involuntarily* waived their attorney-client privilege as to the Questionnaire. This Court disagrees. Involuntary waiver requires an "oops" moment: that is, the party asserting the privilege must have erroneously made disclosure when, in fact, the party did not intend to make disclosure. Here, the Debtors intended to file the amended Schedules, so there was no error that needs to be corrected. If the Debtors, in filing their amended Schedules, had also filed the Questionnaire containing their handwritten comments and the comments of their counsel, and then discovered what had happened, and then the Debtors moved to seal this Questionnaire, this Court would then be facing a legitimate involuntary disclosure situation. At this point, the Debtors would bear the burden of showing that they took reasonable steps to prevent the filing of the Questionnaire and also that they took immediate steps to correct the error once they discovered it. Accordingly, because the Questionnaire was never mistakenly distributed to the UST or any other third party, the Debtors have never waived the attorney-client privilege as to the Questionnaire.

In sum, while the Debtors failed to establish the second and third elements of the attorney-client privilege for the Handwritten Debtors' Draft Schedule, the Debtors have established each element for the Questionnaire. The Questionnaire was completed by the Debtors with their counsel for the purpose of obtaining legal advice and was intended to be confidential. The Questionnaire also does not fall under either exception to the attorney-client privilege; it was not made for the purpose of a crime or fraud, and the privilege was never waived. The Questionnaire is therefore protected by the attorney-client privilege. The Handwritten Debtors' Draft Schedule, however, is not.

## D. The Work-Product Doctrine Protects Both the Questionnaire and the Handwritten Counsel's Draft Schedule from Disclosure.

In their Privilege Log, the Debtors assert that the Questionnaire and the Handwritten Counsel's Draft Schedule constitute attorney work-product and are, therefore, protected from disclosure. This Court agrees for the reasons set forth below.

The work-product doctrine protects from discovery materials prepared by an attorney in anticipation of litigation. FED. R. CIV. P. 26(b)(3); *In re Grand Jury Proceedings*, 601 F.2d 162, 171 (5th Cir. 1979).

> "Unlike the attorney-client privilege, the work product privilege is held by both the client and the attorney and may be asserted by either one." Additionally, the "work-product doctrine . . . differs from the attorney-client privilege in that it serves to promote the adversary system." A party resisting discovery based on this doctrine has the burden of showing that the materials are, in fact, work product by establishing four elements.

*In re Hardwood P-G, Inc.*, 403 B.R. 445, 462–63 (Bankr. W.D. Tex. 2009) (citations omitted).

> [(1)] the materials must be documents or tangible things. [(2)] the materials must be prepared in anticipation of litigation or for trial. In other words, the party had reason to anticipate litigation and "the primary motivating purpose behind the creation of the document was to aid in possible future litigation." [(3)] the materials must be prepared by or for a party's representative. [(4)] if the party seeks to show that material is opinion work-product, that party must show that the

material contains the mental impressions, conclusions, opinions, or legal theories
of an attorney or other representative of a party.

*Ferko v. National Ass'n for Stock Car Auto Racing, Inc.*, 219 F.R.D. 396, 400 (E.D. Tex. 2003)
(citations omitted). To successfully assert this privilege, the privilege-holders bear the initial
burden. If the party resisting discovery is successful in showing that the materials are protected
by the work-product privilege, the burden then shifts to the opposing party to establish that,
notwithstanding that designation, the materials should still be produced. *SEC v. Brady*, 238
F.R.D. 429, 443 (N.D. Tex. 2006); *Ferko*, 219 F.R.D. at 400. If the material sought is *opinion*
work-product[10], the party seeking the materials must establish "a compelling need for the
information . . . [which is] nearly an absolute protection of opinion work product." *Brady*, 238
F.R.D. at 442. If the material sought is *ordinary* work-product, a court may compel discovery if
the party seeking the materials establishes: (1) a "substantial need of the materials in the
preparation of the party's case"; and (2) an inability "without undue hardship to obtain the
substantial equivalent of the material by other means." *Ferko*, 219 F.R.D. at 401 (quoting Fed.
R. Civ. P. 26(b)(3)). If the court finds that the information can be discovered other than through
the documents at issue, then substantial need does not exist. *Koenig v. Int'l Sys. & Controls
Corp. Sec. Litig. (In re Int'l Sys. & Controls Corp. Sec. Litig.)*, 693 F.2d 1235, 1241 (5th Cir.
1982).

In the dispute at bar, the Debtors assert the work-product privilege in regards to two
documents: the Questionnaire and the Handwritten Counsel's Draft Schedule. [Finding of Fact
No. 10]. In regards to the first element, the UST has requested disclosure of several documents:
"copies of any and all documents, statements or reports provided to you or to your office by or
on behalf of [the Debtors]" in addition to "the original client questionnaires and bankruptcy

---

[10] Opinion work-product constitutes the "mental impressions, conclusions, opinions, or legal theories of lawyers or other representative of the party that is in litigation." *Brady*, 238 F.R.D. at 442.

documents . . . ." [Finding of Fact No. 7]. Thus, the parties do not dispute the first element, i.e., that the materials sought be documents or tangible things. Furthermore, it is undisputed that both documents contain hand-written notes by the Debtors' counsel [Finding of Fact No. 10], thereby establishing the third element, i.e., that the materials were prepared by or for a party's representative. As a result, the remaining elements at issue are: the second element (i.e., that the documents were prepared in anticipation of litigation or for trial); and the fourth element (i.e., that the documents contain the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party).

1. **Element #2:** **The Debtors Have Demonstrated that the Questionnaire and Handwritten Debtors' Draft Schedule Were Prepared in Anticipation of Litigation.**

The attorney work-product privilege can apply where litigation is not imminent, as long as the "primary motivating purpose behind the creation of the document was to aid in possible future litigation." *Ferko*, 219 F.R.D. at 400. The key question is therefore whether documents prepared in anticipation of bankruptcy are prepared in anticipation of litigation. The Fifth Circuit has implied that the filing of a bankruptcy petition itself creates litigation. *Windbrooke Development Corp. v. Environmental Enterprises, Inc.*, 524 F.2d 461, 463 (5th Cir. 1975) ("This is proper since the Civil Rules are applicable to bankruptcy cases in order that the procedure for bankruptcy cases will conform as nearly as possible to the procedure following in other civil litigation."); *In re Cornelius*, No. 02-11034-RLJ-7, 2003 Bankr. LEXIS 610, at *5 (Bankr. N.D. Tex. June 18, 2003) ("A petition under the Bankruptcy Code commences a bankruptcy case."); *In re James*, No. 05-46095-DML-7, 2005 Bankr. LEXIS 2047, at *5 (Bankr. N.D. Tex. Oct. 18, 2005) ("[T]he commencement of a bankruptcy case is a legal action . . . ."). Indeed, it is quite logical to conclude that the filing of a bankruptcy petition constitutes litigation because the filing

of a petition imposes the automatic stay on all creditors—and the automatic stay is nothing more than an injunction; and, injunctions can only be obtained through the filing of a lawsuit. *See Sanchez v. Ameriquest Mortg. Co. (In re Sanchez)*, 372 B.R. 289, 311 (Bankr. S.D. Tex. 2007) ("An automatic stay is a self-executing injunction . . . ."); *see also Shanks v. City of Dallas*, 758 F.2d 1092, 1096 (5th Cir. 1985) ("A preliminary injunction is typically granted during the pendency of a lawsuit to prevent irreparable injury that may result before a final decision on the merits.")  For all of these reasons, this Court concludes that the filing of a bankruptcy petition constitutes the filing of a lawsuit; and, therefore, this Court concludes that documents prepared in anticipation of a bankruptcy filing are prepared for litigation.  Accordingly, these documents may be protected by the attorney work-product doctrine. *Contra Naegele*, 468 F. Supp. 2d at 174 (holding—without citation—that within the context of a criminal proceeding, "[the defendant's] bankruptcy filing was not itself 'litigation' in anticipation of which protected attorney work product can be created.").

In sum, the Debtors have shown that the Questionnaire and Handwritten Counsel's Draft Schedule were prepared in anticipation of the Debtors' bankruptcy filing; therefore, this Court finds that these documents were created in anticipation of litigation.

2. Element #4:  The Debtors Have Demonstrated that the Questionnaire and the Handwritten Counsel's Draft Schedule are Opinion Work-Product.

In the Fifth Circuit, the "mental impressions, conclusions, opinions, or legal theories of lawyers or other representative[s] of the party that is in litigation . . . [have] 'almost absolute protection . . . .'" *Hardwood P-G*, 403 B.R. at 463 (citations omitted).  This category of work-product is opinion work-product and is elevated in privilege protection above ordinary work-product. *Id.*

In the dispute at bar, the Debtors assert that the Questionnaire "contains notes written by counsel for the Debtors during follow-up consultation and final preparation of Schedules." [Finding of Fact No. 10]. At the Hearing, Patterson confirmed this purpose, stating that the first page of the Questionnaire is not a handout that Patterson's firm's debtors/clients take home. [Finding of Fact No. 15]. Instead, the first page of the Questionnaire is completed at his firm's office while both the debtor and the attorney are present. [Finding of Fact No. 15]. Either the attorney fills in the first page of the Questionnaire himself when meeting with the client, or the first page of the Questionnaire is filled in by the client at the firm's office while the client goes through the document with the lawyer. [*Id.*]. The remaining pages of the Questionnaire are not given to every client. [*Id.*]. As every client is different, each lawyer at Patterson's firm uses the handout differently. [*Id.*]. The pages of the Questionnaire are also frequently updated and changed by lawyers at Patterson's firm over time such that different versions of the form are in use at any given time. [*Id.*]. Under all of these circumstances, this Court concludes that the Questionnaire is opinion work-product.

The Debtors also contend that the Handwritten Counsel's Draft Schedule was "written by counsel for the Debtors during an in-office conference with the Debtors on June 8, 2012." [Finding of Fact No. 10]. Indeed, the UST does not dispute that the Handwritten Counsel's Draft Schedule notes were made by Patterson and/or Goott. As such, the Court finds that the Debtors have met their burden to prove that the Handwritten Counsel's Draft Schedule is opinion work-product.

3.  The UST Has Not Shown a Compelling Need for the Questionnaire or the Handwritten Counsel's Draft Schedule.

As the Debtors have proven that the work-product privilege is applicable, the burden shifts to the UST. Because the documents in question contain opinion work product, these

documents can only be discoverable if the UST shows "a compelling need for the information . . . ." *Hardwood P-G*, 403 B.R. at 463–64 (quoting *Brady*, 238 F.R.D. at 442). Establishing a compelling need requires more than establishing a "substantial need" and an "undue hardship," both of which are required to be proven to overcome the work-product privilege as to ordinary work-product. *Id.*

In the case at bar, the UST has not argued compelling, or even substantial, need and undue hardship. Rather, the UST merely states that there is a difference between the original Schedules and the amended Schedules; that the Debtors have failed to make full disclosure; and that "we've been unable to really determine why there wasn't full disclosure in this case." [Tape Recording, 09/27/12 Hearing at 2:45:54–2:47:03 p.m.]. This argument is not sufficient.

Nor is this information unavailable through other means. *See Brady*, 238 F.R.D. at 443 ("[W]ork product immunity only protects the documents and not the underlying facts, thus, if a party can procure the information sought through other avenues, such as depositions, then undue hardship has not been shown."). At the Hearing, Patterson argued that the UST can, at any time, discuss the information the UST seeks with the Debtors themselves. [Tape Recording, 09/27/12 Hearing at 2:58:08–2:58:30 p.m.]. With this alternative available to the UST—the UST can depose the Debtors—there is not a substantial need at present for the requested documents.

The UST has also failed to assert undue hardship; instead, counsel for the UST stated at the Hearing that the information to support the filed bankruptcy petition, the Schedules, and the SOFA *should* be discoverable. [*Id.* at 3:06:00–3:06:54 p.m.]. However, the burden to prove undue hardship is on the party seeking discovery (i.e., the UST), and a broad, unsubstantiated assertion is not sufficient. *Koenig*, 693 F.2d at 1240. As a result, this Court finds that the UST has not met its burden to prove undue hardship.

## V. CONCLUSION

Contrary to the bright-line dicta rule articulated in *White*, this Court concludes that the attorney-client privilege *may* protect all conversations and communications between a debtor and his/her bankruptcy attorney regarding the completion of the Petition, the SOFA, and the Schedules. Attorneys provide expertise to their clients, and even in the bankruptcy context, a debtor should be able to enjoy the benefits of "full and frank communication" with his/her counsel.

However, this privilege is *not* automatic; a debtor cannot merely make a blanket assertion. A debtor *must* prove that the communications were made to counsel, for the primary purpose of securing legal services, and, most importantly, with the intent that they remain confidential. *Robinson,* 121 F.3d at 974.

In the case at bar, the Debtors have met their burden of establishing that the attorney-client privilege protects the Questionnaire, but have failed to establish that the privilege protects the Handwritten Debtors' Draft Schedule. Accordingly, this Court concludes that the Debtors need to produce the Handwritten Debtors' Draft Schedule to the UST in unredacted form.

Moreover, this Court finds that the work-product privilege protects the Questionnaire and the Handwritten Counsel's Draft Schedule. The Fifth Circuit requires that claimants of the work-product privilege prove that the privilege applies. The Debtors have provided this Court with competent evidence to meet this burden, and the UST has not met its own burden to demonstrate a compelling need for the documents. Accordingly, this Court concludes that these documents need not be produced to the UST.

An order consistent with these findings and conclusions will be entered on the docket simultaneously with the entry of this Memorandum Opinion.

Signed on this 16th day of November, 2012.

Jeff Bohm
Chief United States Bankruptcy Judge