

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**ENTERED**
**02/14/2013**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **Frank McDowell and** | § | **Case No: 12-31231** |
| **Lori McDowell,** | § | |
| | § | **Chapter 7** |
| Debtors. | § | |

## MEMORANDUM OPINION ON MOTION OF THE UNITED STATES TRUSTEE TO DISMISS CHAPTER 7 CASE PURSUANT TO 11 U.S.C. § 707(b)(3)
[Relates to Doc. No. 20]

### I.   INTRODUCTION

The instant case presents a fairly routine motion to dismiss brought pursuant to 11 U.S.C. § 707(b), and requires the Court to determine two issues.  First, as a preliminary matter, the Court must determine whether the debtors' debts are primarily consumer in nature.  Second, if the Court finds that their debts are primarily consumer in nature, it must then determine whether the totality of the circumstances demonstrates abuse or the debtors filed their petition in bad faith, thus warranting dismissal of the debtors' case under section 707(b)(3) of the Bankruptcy Code.[1]

This case also presents the opportunity for this Court to examine the application of principles of judicial estoppel to a situation in which the debtors represented on their initial petition and in their initial Schedules that their debts are primarily consumer in nature, but later amended these filings to represent that their debts are primarily non-consumer.  Ultimately, the Court concludes that the debtors should be judicially estopped from re-characterizing their debts as primarily non-consumer where, as here, the Court has relied upon and accepted the prior characterization as primarily consumer.  The Court

---

[1] Any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section refers to a section in 11 U.S.C., which is the United States Bankruptcy Code unless otherwise noted.

also concludes that even if judicial estoppel is inapplicable, the debtors' debts are, in fact, primarily consumer in nature, that the totality of the circumstances demonstrates abuse, and that the debtors have filed their Chapter 7 petition in bad faith. Thus, dismissal of the debtors' case is warranted pursuant to section 707(b)(3).

The Court now makes the following written Findings of Fact and Conclusions of Law pursuant to Federal Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 52, as made applicable by Federal Rule of Bankruptcy Procedure 7052. To the extent that any Finding of Fact is construed to be a Conclusion of Law, it is adopted as such. To the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such. The Court reserves the right to make any additional Findings and Conclusions as may be necessary or as requested by any party.

## II.   FINDINGS OF FACT

1.   On February 15, 2012, Frank McDowell and Lori McDowell (the Debtors) filed a voluntary petition under Chapter 7. [Doc. No. 1]. At the same time they filed their petition, the Debtors also filed their initial Schedules and Statement of Financial Affairs (SOFA). [Doc. No. 1, pgs. 8–39].

2.   On their original petition, the Debtors represented that their debts were primarily consumer debts by checking the appropriate box. [Doc. No. 1, p. 1].

3.   On May 11, 2012, the United States Trustee (the UST) filed a motion to dismiss the Debtors' case pursuant to section 707(b) of the Code (the Motion). [Doc. No. 20]. The Debtors failed to file a timely response to the Motion. Therefore, this Court granted the Motion and dismissed the Debtors' case on June 6, 2012. [Doc. No. 24].

4.      On June 12, 2012, the Debtors filed an amended petition, amended Schedules, and an amended SOFA.  [Doc. Nos. 26, 27 & 28].   The amended Schedules contain significant changes from the original Schedules, a number of which are important to the dispute at bar.   First, the Debtors disclosed an additional $3,618.87 in combined average monthly income.[2]   [Doc. No. 27, p. 27].   The Debtors' scheduled average monthly expenses also increased by $1,830.00.  [Doc. No. 27, p. 28].   Additionally, the Debtors disclosed a 40% ownership interest in a business—Covers & Chrome, LLC—on their amended Schedule B.   [Doc. No. 27, p. 9].  The Debtors also now represent that a number of debts which they had listed initially as consumer debts are, instead, business debts.   Among the most significant of these changes are the re-characterization of the debt owed to Ford Motor Credit for Mr. McDowell's Ford F250 as a business debt [Doc. No. 27, p. 10] and the representation that the Debtors both work out of their home, the implication being that a portion of the mortgage debt owed to Flagstar Bank is thus a business debt.  [Doc. No. 27, p. 5].  Finally, on their amended petition, the Debtors changed their initial designation of the nature of their debts as primarily consumer debts, instead indicating that their debts are primarily business debts. [Doc. No. 26, p. 1].

5.      On June 18, 2012, the Debtors filed a motion to vacate the dismissal order.  [Doc. No. 32].   This Court granted the motion to vacate on July 23, 2012.  [Doc. No. 43].

---

[2] The additional income resulted from Mr. McDowell obtaining employment and Ms. McDowell changing jobs.

6.     With the Debtors' case re-opened, a hearing on the Motion was then set.  [Doc. No. 43].  The Debtors now oppose the Motion on the grounds that section 707(b) is inapplicable to them since their debts are not primarily consumer in nature.

7.     This Court held evidentiary hearings on January 16 and 18, 2013.  The Court then took the matter under advisement.

### III.     CREDIBILITY OF WITNESSES

Five persons gave testimony at the hearing on the Motion:  (1) Frank McDowell, one of the debtors in this case; (2) Lori McDowell, the other debtor in this case; (3) Cynthia Wright, a paralegal with the office of the UST; (4) Barbara Griffin, a bankruptcy analyst with the office of the UST; and (5) Miriam Goott, the Debtors' bankruptcy attorney.  The Court finds that, for the most part, the witnesses made forthright efforts to respond to the specific questions posed to them and, therefore, the Court finds that the witnesses are credible.  However, the Court gives no weight to any self-serving testimony on behalf of the Debtors—for example, testimony that the Debtors "acted in good faith." Further, the Court notes that to the extent the Debtors' testimony contradicts or is inconsistent with representations that they have made in their tax returns, the Court gives no weight to their testimony and gives substantial weight to the representations made in the tax returns.

### IV.     CONCLUSIONS OF LAW

#### A.  Jurisdiction and Venue

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and (b), 28 U.S.C. § 157(a) and (b)(1), and 28 U.S.C. § 151.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) because it concerns the administration of the

4

Debtors' bankruptcy estate.  Additionally, this dispute is a core proceeding under the general "catch-all" language of 28 U.S.C. § 157(b)(2).  *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that a matter may constitute a core proceeding under 28 U.S.C. § 157(b)(2) "even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance").  Venue is proper pursuant to 28 U.S.C. § 1408(1).

### B. Constitutional Authority to Enter a Final Order

The Supreme Court case of *Stern v. Marshall* sets forth certain limitations on the constitutional authority of bankruptcy courts to enter final orders.  *Stern v. Marshall*, 131 S. Ct. 2594 (2011).  Therefore, this Court has a duty to question its constitutional authority to enter a final order for any matter brought before it.  The Court concludes that the facts in the pending case are distinguishable from those in *Stern*, and that here, this Court has the authority to enter a final order.  In *Stern*, the debtor filed a counterclaim based solely on state law, and the resolution of this counterclaim did not resolve the validity, or invalidity, of the claim held by the defendant.  *Id.*  Here, on the other hand, the UST seeks dismissal of the Debtors' case under 11 U.S.C. § 707(b)—a federal bankruptcy statute.  As the Motion and the requested relief are both based on an express provision of the Code, rather than on state law, this case is easily distinguishable from the suit in *Stern*.  This Court is, therefore, constitutionally authorized to enter a final order in this dispute.

### C. 11 U.S.C. § 707(b) Only Applies to Individual Debtors with Primarily Consumer Debts.

In the instant case, the UST has brought a motion to dismiss under section 707(b) of the Code.  That section provides, in relevant part:

> (1) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee . . . *may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts*, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title [11 USCS §§ 1101 et seq. or 1301 et seq.], if it finds that the granting of relief would be an abuse of the provisions of this chapter [11 USCS §§ 701 et seq.].

11 U.S.C. § 707(b)(1) (emphasis added).  Thus, in order for section 707(b) to apply, this Court must first find that the Debtors' debts are primarily consumer debts.  *See Matter of Booth*, 858 F.2d 1051, 1055 (5th Cir. 1988) ("The existence of consumer, rather than business-related, debts is a prerequisite to the application of this section.").  The Court will address this issue first.

### D. The Debtors' Debts are Primarily Consumer Debts because the Debtors are Judicially Estopped from Re-classifying Their Debts as Primarily Business Debts.

The Debtors indicated on their original petition that their debts are primarily consumer debts [Finding of Fact No. 2], yet they now assert that their debts are primarily business debts and that, therefore, section 707(b) does not apply.  However, the UST relied on the initial characterization as primarily consumer debts in filing the Motion—to which the Debtors did not respond [Finding of Fact No. 3]—and this Court also relied on this characterization in initially granting the Motion.  Thus, the first question this Court will address is whether the Debtors should be judicially estopped from now asserting that their debts are primarily business debts since they failed to disclose an ownership interest

in a business on their original Schedules and, instead, represented that they had primarily consumer debts.

Judicial estoppel is an equitable doctrine that "can be invoked by a court to prevent a party from asserting a position in a legal proceeding that is inconsistent with a position taken in a previous proceeding." *Love v. Tyson*, 677 F.3d 258, 261 (5th Cir. 2012). The underlying notion behind applying principles of judicial estoppel in bankruptcy cases is that "the integrity of the bankruptcy system depends on full and honest disclosure by debtors of all of their assets." *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 208 (5th Cir. 1999) (quoting *Rosenshein v. Kleban*, 918 F. Supp. 98, 104 (S.D.N.Y. 1996)). Courts generally look to the following criteria to determine whether judicial estoppel should be applied: "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011).

A number of courts have applied principles of judicial estoppel in the context of debtors who fail to disclose causes of action in bankruptcy. *See, e.g., id.* (noting that the debtor was estopped from pursuing a cause of action which he concealed during his bankruptcy, but that the trustee was not prevented from pursuing it for the benefit of the estate); *Love*, 677 F.3d 258 (applying judicial estoppel to prevent a debtor from pursuing a cause of action which he initially did not disclose, even though he later amended his Schedules to disclose it); *In re Jackson*, No. 06-36268, 2012 WL 3071218 (Bankr. S.D. Tex. July 27, 2012) (concluding that the debtor was estopped from amending his Schedules to disclose a previously undisclosed asset and a cause of action and that, while

the trustee could administer the asset and the cause of action, the debtor could receive no benefit from them even if all claims were paid in full and excess funds remained); *In re Walker*, 323 B.R. 188 (Bankr. S.D. Tex. 2005) (holding that a debtor was estopped from reopening her case in order to amend her Schedules to disclose a personal injury lawsuit).

A review of case law has revealed no cases in which judicial estoppel was applied to a fact pattern like the one currently at bar.   However, courts have noted that the application of judicial estoppel is not governed by "inflexible prerequisites or an exhaustive formula for determining its applicability," and "numerous considerations may inform the doctrine's application in specific factual contexts."   *Love*, 677 F.3d at 261 (citing *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001)).   Therefore, this Court will examine the application of the three articulated elements to the facts at hand, utilizing the above-cited cases for reference and remaining mindful of the overarching goal to apply judicial estoppel in a way so as "to deter dishonest debtors . . . ."   *Reed*, 650 F.3d at 574.

     1.    <u>The Debtors are presently asserting a legal position which is plainly</u> <u>inconsistent with the initial position that they took in this Court.</u>

The first element courts assess in determining whether to apply judicial estoppel is whether "the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position." *Reed*, 650 F.3d at 574.   In the case at bar, this prong is easily satisfied.   The Debtors' current position that their debts are primarily non-consumer debts [Finding of Fact No. 4] is plainly inconsistent with their prior position that their debts are primarily consumer debts.   Specifically, the Debtors represented in their original petition, which was signed under penalty of perjury, that their debts were primarily consumer debts.   [Finding of Fact No. 2].   They also represented in their sworn Declaration for Electronic Filing that the information set forth

in their petition and Schedules was true [UST Ex. 2A], and testified under oath at the meeting of creditors that their original petition and original Schedules were truthful and accurate.[3]  *See* [Doc. No. 34, p. 2].

Additionally, the Debtors failed to raise this argument (i.e., that their debts are primarily non-consumer and that therefore, section 707(b)(3) does not apply) in response to the Motion when it was originally filed—in fact, they failed to respond to the Motion at all.  [Finding of Fact No. 3].  The Motion was brought pursuant to section 707(b)(3) and expressly sets forth that the "Debtors checked on the petition that the nature of the debts is primarily consumer debts."  [Doc. No. 20, p. 2].  Presumably, if the Debtors' debts were, in fact, primarily non-consumer and section 707(b)(3) therefore did not apply, then the Debtors would have raised this defense in response to the Motion in order to avoid having their case dismissed.  Moreover, the Local Rules for the Southern District of Texas state that the "[f]ailure to respond [to a motion] will be taken as a representation of no opposition[,]" or in other words, that the facts alleged are true.  S.D. Tex. Local R. 7.4.  By failing to initially object to the Motion, the Debtors thereby implied that their debts are primarily consumer in nature.  Thus, the Debtors' current position that their debts are primarily non-consumer is directly at odds with their prior express and implied representations to this Court that their debts are primarily consumer in nature.  The first element of judicial estoppel is, therefore, met.

2.  This Court accepted the Debtors' position that their debts are primarily consumer debts in initially granting the Motion.

---

[3] In discussing the first element of judicial estoppel in *In re Walker*, this Court noted that the debtor's failure to mention a potential cause of action at the meeting of creditors was relevant to demonstrating her prior inconsistent position.  *In re Walker*, 323 B.R. at 195.

The second element—that a court accept the debtor's prior inconsistent position—is also satisfied in the case at bar.  This Court accepted the Debtors' prior position that their debts are primarily consumer debts when it granted the Motion and dismissed the case pursuant to section 707(b) [Finding of Fact No. 3], which—it must be remembered—only applies to individual debtors whose debts are *primarily consumer* in nature.

      3.    <u>The Debtors did not act inadvertently because they had knowledge of the nature of their debts and had a motive to attempt to re-classify their debts as primarily non-consumer debts.</u>

The third element courts consider in determining whether judicial estoppel should apply is that the debtor did not act inadvertently.  In determining whether the debtor acted inadvertently, the focus is on whether the debtor lacked knowledge or had no motive for the action undertaken.  *Coastal Plains*, 179 F.3d at 205.  This element is satisfied in the instant case because the Debtors:  (1) had knowledge of the nature of their debts at the time they represented that their debts are primarily consumer; and (2) had a motive thereafter to attempt to re-classify their debts as primarily non-consumer.

      **a.**    **The Debtors had knowledge of the nature of their debts.**

The Debtors have made no argument and introduced no evidence to show that they lacked knowledge as to the purposes for which their debts were incurred.  As the Debtors themselves incurred the debts, it follows that they would know the nature of their debts and whether they were incurred primarily for personal, family, or household purposes.  Further, the Debtors knew the nature of their debts at the time they filed their petition and offered no satisfactory explanation for thereafter attempting to re-characterize the nature of these debts.

      **b.**    **The Debtors had a motive to attempt to re-characterize their debts as non-consumer debts.**

Here, the Debtors had a motive to attempt to reclassify their debts as primarily business debts—namely, so that section 707(b) would not apply.  Although this motive might exist to some extent for every individual Chapter 7 debtor, here it is important to recognize that this Court initially dismissed the Debtors' case under section 707(b). [Finding of Fact No. 3], which it could not do unless the debts were primarily consumer debts.  Thereafter, in order to seek to have the order dismissing their case vacated, the Debtors had to amend their Schedule I to accurately reflect their increased income. When they did so, the Debtors had a corresponding motivation to try to increase their expenses so that the presumption of abuse would not arise, or to try to classify their debts as primarily business debts so that section 707(b) would not apply at all.  Thus, because the Debtors had knowledge of the nature of their debts and had a motive to attempt to re-classify their debts as non-consumer, the Court finds that the third element of judicial estoppel is met.

In sum, all three elements for application of judicial estoppel are satisfied in the case at bar.  The Debtors' current position that their debts are primarily non-consumer is inconsistent with their prior position that their debts are primarily consumer in nature. This Court accepted the Debtors' prior characterization of their debts as primarily consumer in granting the Motion under section 707(b)(3).  Finally, the Debtors did not act inadvertently, and in fact had a motive to attempt to re-characterize their debts as non-consumer so that section 707(b) would not apply at all.  Therefore, this Court concludes that judicial estoppel applies and that the Debtors are estopped from now asserting that their debts are primarily non-consumer in nature.  This finding is in keeping with the

policy behind applying judicial estoppel in the bankruptcy context—namely, that debtors should not be permitted to amend their Schedules after their initial position has redounded to their detriment due to a motion filed by a third party. Thus, the Debtors are judicially estopped from denying that their debts are primarily consumer debts. And, because they are estopped from doing so, section 707(b) continues to apply to them.

### E. Even if the Debtors are not Judicially Estopped From Re-Characterizing Their Debts as Primarily Business Debts, their Debts Are, in Fact, Primarily Consumer Debts, and therefore Section 707(b) Applies.

This Court has concluded that the Debtors should be judicially estopped from attempting to re-characterize their debts as primarily non-consumer in nature. However, even if the principles of judicial estoppel do not apply, the Debtors' debts are, in fact, primarily *consumer* in nature. The Debtors' attempted re-characterization of two debts in particular—their mortgage debt owed to Flagstar Bank and the debt owed to Ford Motor Credit for Mr. McDowell's F250 truck—fails. The result is that more than fifty percent of their debts are consumer, which means that section 707(b)(3) does indeed apply.

The Code defines consumer debt as a "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). And, while the Code does not define non-consumer or business debt, the Fifth Circuit has stated that "the test for determining whether a debt should be classified as a business debt . . . is whether it was incurred with an eye toward profit." *Matter of Booth*, 858 F.2d at 1055. Thus, to determine whether a debt is consumer or non-consumer, the focus is on the purpose for which the debt was incurred. Finally, the term "primarily consumer debts" in section 707(b) means that the consumer debts must amount to more than half of the total dollar

amount owed.[4]  *Id.*  Even accepting the Debtors' characterizations of certain debts as business debts, the Court nevertheless finds that more than fifty percent of their total debts are consumer debts; therefore, section 707(b)(3) applies.

   1. <u>The debt owed to Ford Motor Credit is, at most, 54.87 percent non-consumer in nature.</u>

In their amended Schedules, the Debtors have re-characterized the debt owed to Ford Motor Credit as a business debt. [Finding of Fact No. 4]; [Doc. No. 27, p. 10].  This debt is secured by a Ford F250 truck, which Mr. McDowell purchased on May 26, 2011. [Tape Recording, 01/16/13 Hearing at 10:14:36–46 a.m.].  Although classified as purely a business debt on the Debtors' amended Schedule D [Doc. No. 27, p. 16], Mr. McDowell's testimony and the Debtors' 2011 tax return both indicate that he has not used the F250 exclusively for business purposes, but rather has used it for both personal and business purposes.

First, Mr. McDowell's own testimony was that he has not used the F250 exclusively for business purposes.  Mr. McDowell indicated that he purchased the F250 at a time when his business, Covers & Chrome, LLC, was *not* operating.  [Tape Recording, 01/16/13 Hearing at 10:48:16–18 a.m.].  While he testified that he primarily

---

[4] The Fifth Circuit in *Booth* also indicated that the total number of consumer debts relative to the number of non-consumer debts is relevant to the determination of whether the debtor has primarily consumer debts. *Id.*  This is the minority position; a majority of courts now look solely to the dollar amount of the debt to determine whether it is primarily consumer. *See In re Hoffner*, 2007 Bankr. LEXIS 4494, at *6 (Bankr. D.N.D. Nov. 21, 2007) (noting that only a minority of courts "consider both the percentage of consumer debt as well as the number of consumer debts in deciding whether the debt is primarily consumer debt.").  In fact, at least one recent case from a lower court within the Fifth Circuit indicates that the consideration of the total number of debts may have been abandoned in this Circuit as well. *See Beacher v. Pena (In re Beacher)*, 358 B.R. 917, 920 (Bankr. S.D. Tex. 2007).  In any event, here, even if this Court accepts as true (which it does not) the Debtors' characterization of their debts, the Debtors' total number of consumer debts is more than the total number of non-consumer debts.  Specifically, eighteen of the debts are consumer (including those that are consumer, in part, like the F250) and seventeen of the debts are non-consumer (including those that are non-consumer in part). *See* [Doc. No. 27]; [UST Ex. 20].

13

used the vehicle to look for work, he admitted that he also used it for personal purposes. [*Id.* at 10:48:38–10:48:46 a.m.].  Additionally, when the UST questioned Mr. McDowell about mileage records he maintained for the F250, he was unable to recall the purposes of some of the trips and was unable to state whether all of them were business-related.  [*Id.* at 10:53:20–45 a.m.].

Second, the Debtors' own 2011 tax return indicates that the F250 was used for business purposes only 54.87 percent of the time.  [UST Ex. 8B, p. 11].  As Mr. McDowell testified that he used mileage records, which he kept on a weekly basis, to prepare the tax return [Tape Recording, 01/16/13 Hearing at 11:02:03–30 a.m.], the characterization in the tax return is likely accurate.  Thus, the Court will rely on the characterization of the F250 in the Debtors' 2011 tax return and finds that 54.87 percent of the debt owed on the F250, or $31,985.37, is non-consumer debt while the remaining 45.13 percent of the debt, or $26,307.63, is consumer debt.[5]

2.   <u>The Debtors have failed to show that the debt on their home mortgage is a non-consumer debt.</u>

The Debtors' amended Schedule A indicates that both of the Debtors "office out of their home."  [Doc. No. 27, p. 5].  Therefore, the Debtors argue that some portion of their mortgage debt owed to Flagstar Bank should be classified as business debt.

Typically, residential mortgage loans are classified as consumer debts.  *See Cox v. Fokkena (In re Cox)*, 315 B.R. 850, 855 (B.A.P. 8th Cir. 2004) ("With respect to debt secured by real property, if the debtor's purpose in incurring the debt is to purchase a home or make improvements to it, the debt is clearly for family or household purposes

---

[5] The Fifth Circuit has held that a debtor's debt can be bifurcated into part consumer debt and part business debt. *Matter of Booth*, 858 F.2d at 1055 (applying this principle and classifying the debtors' mortgage debt as part consumer and part non-consumer where a portion of the loan was used to fund a business venture).

and fits squarely within the definition of a consumer debt.") (citing *Zolg v. Kelly (In re Kelly)*, 841 F.2d 908, 912 (9th Cir. 1988)).  However, mortgage debt can be classified as business debt, for example, when a debtor purchases a home for investment purposes or uses proceeds from a home equity loan to fund a business.  *See, e.g., Matter of Booth*, 858 F.2d at 1055.  And, in another case where the UST brought a motion to dismiss under section 707(b), the debtor made a similar argument that, because portions of her home were used for business, the entire mortgage debt should not be classified as a consumer debt.  *In re Newman*, No. 05-35957-RCM-7, 2006 Bankr. LEXIS 4672, at *3 (Bankr. N.D. Tex. Mar. 13, 2006).  However, while the debtor in *Newman* testified at trial that she used fifty percent of her home for business purposes, the court noted that on her tax return, she had claimed that only thirty percent of her home was used for business.  *Id.* The court went on to conclude that the debtor's debts were primarily consumer debts and ultimately held that the case would be dismissed under section 707(b) unless the debtor converted the case to a Chapter 13 within ten days.  *Id.* at *5, *14.

        In the case at bar, Ms. McDowell testified that the Debtors purchased their home in 2001 [Tape Recording, 01/16/13 Hearing at 3:12:30–38 p.m.] with the intent to use some portion of it as a business office.  [*Id.* at 3:16:25–30 p.m.].  Ms. McDowell estimated that, of the last ten years, Mr. McDowell had worked from home for three to four of those years and that she had worked from home throughout that time for a couple of days each week; but, she testified that with her new job, she now works from home one hundred percent of the time.  [*Id.* at 3:15:35–52 p.m.].  Additionally, Ms. McDowell testified that two rooms were used by herself and her husband for office space—one actual office and the other a spare bedroom.  [*Id.* at 3:16:08–22 p.m.].  And, while Ms.

McDowell testified that the home has four bedrooms [*Id.* at 3:12:40–45 p.m.], no evidence was presented as to the portion or percentage of the home used for offices relative to the overall size of the home.

As in *Newman*, this Court gives significant weight to the Debtors' tax returns to determine whether their home was, in fact, used for business purposes, and if so, what portion.  Despite Ms. McDowell's testimony that the Debtors have offices in their home, the Debtors did not claim any home office tax exemption on either their 2010 or 2011 tax returns.  *See* [UST Ex. 8A & 8B].  In fact, Ms. McDowell testified that when they (i.e., the Debtors) originally filed their petition, neither of them worked from home and that they only began working from home in mid-February of 2012, when Mr. McDowell obtained employment and Ms. McDowell changed jobs.  [Tape Recording, 01/16/13 Hearing at 3:05:12–20 p.m.].  Here, again, this Court relies on the characterization in the Debtors' own tax returns and finds that the entire debt owed to Flagstar Bank for the Debtors' home mortgage is a consumer debt.

3.     The Debtors' debts are primarily consumer in nature.

Taking into account the classification of the F250 debt as 54.87 percent non-consumer and the mortgage as entirely consumer debt, and allowing the remainder of the Debtors' own amended classifications to stand,[6] the Debtors' consumer debts amount to

---

[6] At the evidentiary hearing, Ms. McDowell testified that of the $4,591.00 owed to the United States Department of Education for her student loans, eighty-five percent of those funds were used for non-consumer purposes (i.e, her tuition, fees, and directly related expenses, as opposed to living expenses).  The issue of whether student loan debt is consumer or non-consumer is an open question in this Circuit, as it is in many others.  *See, e.g., In re Stewart* 215 B.R. 456, 465 (10th Cir. BAP 1997) (noting that "student loans are not consumer debts per se," and that it is important to examine the purpose for which the debts were incurred and how the funds were actually used).  Without expressly deciding the issue, this Court will accept Ms. McDowell's characterization of her student loans as eighty-five percent non-consumer for the purposes of the dispute currently at bar.  The Court does so because, even accepting Ms. McDowell's characterization as correct, the Debtors' debts are still primarily consumer in nature.  Based on this

$488,858.86, while their non-consumer debts amount to $465,387.60.  Therefore, as more than fifty percent of the Debtors' total debt is consumer debt (51.23 percent, to be exact), the Debtors' debts are primarily consumer in nature.[7]   Accordingly, even if the Debtors are not judicially estopped from denying that their debts are primarily consumer debts, the threshold test for application of section 707(b) has been satisfied.

### F. The Debtors' Case Should be Dismissed under Section 707(b)(3) because the Totality of the Circumstances of their Financial Situation Demonstrates Abuse and, Alternatively, because the Debtors Filed their Chapter 7 Petition in Bad Faith.

Having concluded that section 707(b) applies to the Debtors because their debts are primarily consumer debts, the Court now applies this statutory provision to the case at bar.  Section 707(b)(1) provides that a Chapter 7 case may be dismissed, or converted to a Chapter 11 or 13, if "the granting of relief would be an abuse of the provisions of this chapter."[8]  Section 707(b)(3) further provides that:

> (3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter [11 USCS §§ 701 et seq.] in a case in which the presumption in paragraph (2)(A)(i) does not arise or is rebutted, the court shall consider—
>   (A) whether the debtor filed the petition in bad faith; or
>   (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

---

characterization, this Court will treat $3,902.35 (i.e., eighty-five percent) of the student loan debt as non-consumer debt and the remaining $688.65 (i.e., fifteen percent) as consumer debt.

[7] $488,858.86 divided by $954,246.46 (i.e., the Debtors' total debt) equals 51.23 percent.

[8] This Court has held that the "granting of relief" is synonymous to the "granting of a discharge." *In re Singletary*, 354 B.R. 455, 464–65 (Bankr. S.D. Tex. 2006); *see also Cortez v. U.S. Trustee (In re Cortez)*, 457 F.3d 448, 455 (5th Cir. 2006); *In re Polly*, 392 B.R. 236, 244 (Bankr. N.D. Tex. 2008).

11 U.S.C. § 707(b)(3).

Here, the UST contends first that, under the totality of the circumstances, dismissal is appropriate because "the Debtors have significant disposable income and an ability to make a meaningful distribution to unsecured creditors." [Doc. No. 20, p. 4]. Second, the UST alleges that the "cause may exist to dismiss under [section] 707(b)(3)(A) for bad faith" in light of the Debtors' initial failure to complete and file accurate Schedules and an accurate SOFA. [Doc. No. 20, p. 4].

    1.    <u>Standard for dismissal under section 707(b)</u>

In determining whether dismissal is appropriate under section 707(b), courts consider the following factors, among others:

    (1)   Whether the debtor could pay a substantial portion of his debts from future income in a hypothetical Chapter 13 case;
    (2)   Whether the bankruptcy petition was filed due to sudden illness, calamity, disability, or unemployment;
    (3)   Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;
    (4)   Whether the debtor's proposed family budget is reasonable;
    (5)   Whether the debtor is seeking to reaffirm a large amount of secured debt to the detriment of unsecured creditors;
    (6)   Whether the debtor's Schedules and Statement of Current Income and Expenses reasonably and accurately reflect his true financial condition;
    (7)   Whether the debtor has a stable source of income;
    (8)   Whether the debtor is eligible to file a Chapter 13 case;
    (9)   Whether there are state remedies or private negotiations that the debtor can invoke to ease his financial predicament;
   (10)   Whether the debtor's expenses can be reduced without depriving the debtor of basic necessities; and
   (11)   Whether the petition was filed in good faith.

*In re King*, No. 08-41975, 2009 Bankr. LEXIS 35, at *10–11 (Bankr. E.D. Tex. Jan. 6, 2009). In considering these factors, the overarching focus of the court's inquiry is on the

debtor's ability to re-pay his debts. *Id.*; *In re Kelly*, 841 F.2d 908, 914–15 (9th Cir. 1988); *In re Fitzgerald*, 155 B.R. 711, 716 (Bankr. W.D. Tex. 1993).

"The starting point in any [section] 707(b) analysis centers on the conditions as they existed at the time the petition is filed." *In re King*, 2009 Bankr. LEXIS 35, at *13–14 (citing *In re Pier*, 310 B.R. 347, 354–55 (Bankr. N.D. Ohio 2004); *In re Pennington*, 348 B.R. 647 (Bankr. D. Del. 2006)). Yet, the Fifth Circuit has made clear that this Court may also consider *post-petition* events bearing on these questions in deciding whether to dismiss a case for abuse under section 707(b). *See In re Cortez*, 457 F.3d at 455–56 (holding that bankruptcy courts can, and should, consider post-petition events in determining whether dismissal is appropriate pursuant to section 707(b)). Finally, in order to grant the Motion, this Court notes that it only needs to find abuse, as opposed to *substantial* abuse. *See United States Trustee v. Hilmes (In re Hilmes)*, 438 B.R. 897, 904 (N.D. Tex. 2010) (overturning bankruptcy court's decision which applied a "substantial abuse" standard, and noting that "Congress has clearly lowered the dismissal standard" by changing it from substantial abuse to abuse) (citing *In re Tucker*, 389 B.R. 535, 538 (Bankr. N.D. Ohio 2008)). The legislative history behind the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA) underscores Congress' view that it had become too easy for dishonest debtors to obtain a discharge under the then-existing Code; thus, Congress sought to make it more difficult for dishonest debtors to obtain a discharge by lowering the burden for parties-in-interest and creditors seeking dismissal from one of proving "substantial abuse" to one of proving mere "abuse."

    2.    <u>The Debtors have the ability to repay a substantial portion of their debts from future income in a hypothetical Chapter 11 or 13 case.</u>

Near or very shortly after the time of filing, Mr. McDowell obtained employment and Ms. McDowell changed jobs, resulting in increased income to the Debtors. However, at the same time the Debtors amended their Schedule I to reflect this additional income, they also amended their Schedule J, increasing many of the listed expenses. *See* [Doc. No. 27, pgs. 27 & 28]. The Court finds first, that a number of these increases are without basis; and second, that a number of the scheduled expenses are unreasonable. If the Debtors' expenses were reduced, the Debtors, with their increased income, would have the ability to repay a substantial portion of their debts.

The Debtors' amended Schedule I indicates that their average total monthly income is now $10,361.39. [Doc. No. 27, p. 27]. The chart below summarizes the Debtors' expenses as they appeared on their original Schedule J and on their amended Schedule J:

| | Schedule J - Current Monthly Expenditures | Original | Amended | Difference |
|---|---|---|---|---|
| 1 | Rent/Home Mortgage (excluding property taxes & insurance) | $2,520.00 | $2,520.00 | $0.00 |
| 2a | Utilities: Electricity & heating fuel | $300.00 | $390.00 | $90.00 |
| 2b | Utilities: Water & sewer | $40.00 | $50.00 | $10.00 |
| 2c | Utilities: Telephone | $50.00 | $0.00 | ($50.00) |
| 2d | Utilities: Cable, Internet & phone | $100.00 | $175.00 | $75.00 |
| 3 | Home Maintenance (repairs & upkeep) | $200.00 | $500.00 | $300.00 |
| 4 | Food | $500.00 | $600.00 | $100.00 |
| 5 | Clothing | $100.00 | $100.00 | $0.00 |
| 6 | Laundry & dry cleaning | $20.00 | $30.00 | $10.00 |

| 7 | Medical & dental expenses | $50.00 | $250.00 | $200.00 |
|---|---|---|---|---|
| 8 | Transportation (not including car payments) | $400.00 | $500.00 | $100.00 |
| 9 | Recreation, clubs & entertainment, newspapers, magazines, etc. | $50.00 | $50.00 | $0.00 |
| 10 | Charitable contributions | $50.00 | $30.00 | ($20.00) |
| 11a | Insurance: Homeowner's/Renter's | $200.00 | $208.00 | $8.00 |
| 11b | Insurance: Life | $30.00 | $30.00 | $0.00 |
| 11c | Insurance: Health | $0.00 | $0.00 | $0.00 |
| 11d | Insurance: Auto | $250.00 | $367.00 | $117.00 |
| 11e | Insurance: Property Taxes | $800.00 | $800.00 | $0.00 |
| 12 | Taxes | $0.00 | $0.00 | $0.00 |
| 13a | Installment Payments: Auto: Truck Note | $995.98 | $995.98 | $0.00 |
| 13b | Installment Payments: Other: Country Club dues (appearing on original Schedule J but not on amended Schedule J); Wife's vehicle (appearing on line 17b of original Schedule J but appearing on line 13b of amended Schedule J) | $350.00 | $484.00 | $134.00 |
| 13c | Installment Payments: Other: Child Care | $300.00 | $480.00 | $180.00 |
| 13d | Installment Payments: Other: Cell phones | $100.00 | $150.00 | $50.00 |
| 14 | Alimony, maintenance & support paid to others | $0.00 | $0.00 | $0.00 |
| 15 | Payments of support of add'l dependents not living in your home | $0.00 | $0.00 | $0.00 |
| 16 | Regular expenses from operation of business, profession . . . | $0.00 | $0.00 | $0.00 |

| | | | | |
|---|---|---|---|---|
| 17a | Other: Monthly Timeshare dues (included on both original and amended Schedule J); amended Schedule J also included son's softball, tolls, HOA dues, home alarm system, 401k loan repayment, & home warranty for appliances | $15.00 | $1,025.00 | $1,010.00 |
| 17b | Other: Wife's leased vehicle | $484.00 | $0.00 | ($484.00) |
| **18** | **AVERAGE MONTHLY EXPENSES (Total lines 1-17)** | **$7,904.98** | **$9,734.98** | **$1,830.00** |

*Compare* [Doc. No. 1, p. 30], *with* [Doc. No. 27, p. 28–29]. Thus, of twenty-eight total expense line items, one half (i.e., fourteen) were amended to increase the scheduled expense amount. *Id.* In total, the Debtors' amended Schedule J lists $1,830.00 more in expenditures than did the Debtors' original Schedule J. *Id.*

In a similar case in which the debtors amended their Schedule J to increase a number of expenses such as life insurance, clothing allowance, and home maintenance, the court refused to take into account the increased amounts and, instead, relied on the amounts listed in the Debtors' original Schedule J. *In re Logan*, No. 02-39177-SAF-7, 2003 Bankr. LEXIS 600, at *12 (Bankr. N.D. Tex. June 17, 2003). As that court reasoned, "[t]he debtors signed and submitted their original Schedule J under penalty or perjury [and] have not established a basis to increase these expenses post-petition." *Id.* This logic is equally applicable to the case at hand—here, the Debtors also signed and submitted their original Schedules under penalty of perjury, and have established no basis for the increased expenses. Therefore, just as the court in *Logan* refused to permit the

debtors to "unilaterally change these amounts," here, too, the Debtors are not permitted to do so.[9]  *Id.*

Not only have the Debtors failed to establish a basis for the increased expenses listed in their amended Schedule J, but a number of these expenses are also unreasonable. For example, the Debtors pay $3,528.00, or roughly a third of their monthly income, towards their home mortgage, taxes, and insurance. *See* [Doc. No. 27, p. 28].  In *Camp*, the court noted that $3,360.00 per month for mortgage, taxes, and insurance was "unusually high for a family of three."[10]  *In re Camp*, 416 B.R. 304, 313 (Bankr. E.D. Tex. 2009); *see also In re Nissly*, 266 B.R. 717, 720 (Bankr. N.D. Iowa 2001) (finding that debtors' housing expenses were "unacceptably high" where they exceeded twenty percent of the debtors' monthly income); *In re Baird*, 2005 Bankr. LEXIS 364, at *12 (Bankr. N.D. Iowa Mar. 10, 2005) (finding that monthly mortgage payments amounting to twenty-eight percent of the debtors' monthly income were unreasonable).  The Debtors have also listed $500.00 in home maintenance costs per month, reflecting a $300.00 per month increase from their original Schedule J, yet have offered no explanation as to the necessity of this expense or the reason for its increase.

Additionally, the Debtors pay a total of $1,479.98 each month towards car payments (i.e., $995.98 for Mr. McDowell's truck note, and $484.00 for Ms. McDowell's

---

[9] It is worth noting that the Debtors are not unsophisticated individuals.  Mr. McDowell has operated his own business [Tape Recording, 01/16/2013 Hearing at 10:00:29–50 a.m.], and Ms. McDowell has a Ph.D. in chemical engineering.  [*Id.* at 3:52:50–55 p.m.]  And, the Debtors were represented by counsel in connection with their bankruptcy filing.  *See, e.g.*, [Doc. No. 1, pgs. 2 & 40].  So, they were not flying blind, so to speak, when they completed and signed their original Schedules.

[10] Aside from the high cost of the Debtors' housing expenses, the Debtors' home seems to be larger than is necessary to accommodate their housing and working needs.  For example, Ms. McDowell testified that their home has four bedrooms, that she and Mr. McDowell share one bedroom, that their child uses another, that Mr. McDowell uses one bedroom as an office, that they have a spare guest bedroom, and that the home has an actual office, which she uses.  [Tape Recording, 01/16/13 Hearing at 3:16:08–22 p.m.].

vehicle). [Doc. No. 27, p. 28]. This figure does not include the additional $500 they have listed for other transportation expenses, or the $367.00 they spend per month on automobile insurance. [Doc. No. 27, p. 28]. Thus, in total, the Debtors expend $2,346.98 each month on their two vehicles. By way of comparison, the IRS standard for vehicle costs is $496 per vehicle, per month.[11] The note on the F250 alone is double this amount per month, and the Court finds that this expense is clearly unreasonable. Surely Mr. McDowell could obtain a reliable truck that would serve his working needs without expending nearly $1,000 a month in note payments. Moreover, here, the Debtors are not only expending such an enormous sum, they are also seeking to reaffirm this secured debt while trying to obtain a discharge to avoid paying any appreciable amount to their unsecured creditors.[12] *See* [Doc. No. 27, p. 33].

In addition to overwhelming vehicle expenses, the Debtors have scheduled $250.00 per month in medical and dental expenses on their amended Schedule J without providing an explanation for the $200.00 monthly increase from the original Schedule J. *Compare* [Doc. No. 1, p. 30], *with* [Doc. No. 27, p. 28]. While this figure seems reasonable in and of itself, it is also important to note that Ms. McDowell reduced her pre-tax income by $100.00 for a "Health Savings" deduction. *See* [Doc. No. 27, p. 27].

---

[11] *See* [Doc. No. 20, p. 4]. This Court notes that the IRS standards are not controlling in determining whether abuse arises under section 707(b)(3), but nonetheless, these standards are informative in determining whether certain expenses are unreasonable.

[12] In their motion to vacate this Court's dismissal order of June 6, 2012, the Debtors, in paragraph ten, emphasize that they had $8,100.34 in their bank account on the date of the filing of their Chapter 7 petition. [Doc. No. 32, p. 2]. They then state that "[i]f the Court would reconsider and vacate the order dismissing their Chapter 7 Bankruptcy case, Debtors would turn over these funds to the Chapter 7 Trustee for distribution to their creditors." [Doc. No. 32, p. 2]. Thus, if this Court were to grant a discharge to the Debtors and approve reaffirmation of the debt relating to the truck note, there would only be approximately $8,100.34 to be distributed to the Debtors' unsecured creditors, which represents not even two percent of the total amount of unsecured debts. Aside from the fact that this is a paltry amount given the Debtors' present income, their failure to disclose the $8,100.34 on their initial Schedule B is yet another indication of the Debtors' bad faith in this case.

Therefore, the actual amount that the Debtors have devoted to medical and dental expenses is $350.00 per month.

The Debtors also increased their child care expenses on their amended Schedule J from $300.00 to $480.00 without explanation; and, additionally, on amended Schedule I, Ms. McDowell reduced her income by $357.90 for a "Flex Dependent" deduction, which also goes towards child care costs. Given these amendments, the Debtors have increased their child care costs by $537.90, bringing the total child care expenditure to $837.90 per month (i.e., $10,054.80 per year) for their 8-year-old son. By contrast, the Debtors' 2011 tax return indicates that their child care expenses were only $4,478.00 in that year, or $373.17 per month. *See* [UST Ex. 8B, p. 7]. Thus, the amount the Debtors have scheduled for child care expenses has more than doubled from the amount listed on their 2011 tax return, and they have failed to provide any adequate explanation for this increase.

One other notable item is the Debtors' $595.00 monthly 401(k) loan repayment expense, which goes towards repaying, over the next two years, a loan that Mrs. McDowell took out against her 401(k) retirement account. [Doc. No. 27, p. 29]. Although the Debtors included this item as an expense on their amended Schedule J, "there is an overwhelming consensus among bankruptcy courts that [a] debtor's voluntary payment into pension, savings, or 401(k)-type plans is not a reasonably necessary expenditure . . . ." *In re Hill*, 328 B.R. 490, 495 (Bankr. S.D. Tex. 2005) (quoting *In re Heffernan*, 242 B.R. 812, 818 (Bankr. D. Conn. 1999)); *see also Bolen v. Adams*, 403 B.R. 396, 402 (N.D. Miss. 2009) (holding that a debtor's 401(k) loan repayment obligation is not a debt within the meaning of the Code and should not be allowable as a

deduction in the debtor's means test calculation), *accord McVay v. Otero*, 371 B.R. 190, 195 (Bankr. W.D. Tex. 2007). One court likened the debtors' repayment of a 401(k) loan to "repaying . . . loan debt to themselves [i.e., the debtors] to the detriment of their creditors[,]" and declared that the percentage of the loan payment not attributable to tax consequences should be added back into the debtors' available monthly income. *In re Logan*, 2003 Bankr. LEXIS 600, at *11–12.

In sum, it appears to the Court that many of the Debtors' expenses could be reduced without depriving them of basic necessities. Such a reduction would enable the Debtors to devote a substantial amount of their income towards repayment of their creditors. For example, the Debtors' current monthly income exceeds their originally scheduled expenses by $2,456.41 per month. If this disposable income were committed to a plan of repayment over a term of three years, it would result in $88,430.76 in payments to the Debtors' unsecured creditors, or nearly seventeen percent of the total unsecured claims.[13] *See In re Laman*, 221 B.R. 379, 384 (Bankr. N.D. Tex. 1998) ("[A]buse exists where debtors 'have the ability to pay a significant dollar amount to the unsecured creditors, irrespective of percentage.'").

3.     Other factors support dismissal

Although the Debtors initially contemplated filing for bankruptcy due to Mr. McDowell's unemployment, he obtained employment in early to mid-February of 2012—around the same time the bankruptcy petition was actually filed. Ms. McDowell

---

[13] $2,456.41 per month for thirty-six months (i.e., three years) equals $88,430.76. Further, if the Debtors were to make plan payments for five years, they could potentially pay $147,384.60 to their unsecured creditors (i.e., $2,456.41 per month multiplied by sixty months), or nearly twenty-eight percent of their total unsecured debt. Although the Debtors' debts exceed the limits to be eligible for Chapter 13 bankruptcy, the Debtors are still eligible to file a Chapter 11 bankruptcy which for them, as individual debtors, would function similarly to a Chapter 13.

testified that the Debtors were working with their creditors to settle their debts and pay them down and that, had Mr. McDowell obtained employment, they likely would have been able to pay their debts.  [Tape Recording, 01/16/13 Hearing at 2:56:26–55 p.m.].  As both Debtors now have a stable source of income, this factor leans strongly in favor of dismissal of the Debtors' case.  *See, e.g.*, *In re Camp*, 416 B.R. 304, 313–14; *In re King*, 2009 Bankr. LEXIS 35, at *17.

An additional factor favoring dismissal is that the Debtors are seeking to reaffirm a large amount of secured debt to the detriment of their unsecured creditors—specifically, the $58,293.00 debt owed to Ford Motor Credit for Mr. McDowell's 2011 F250. Reaffirmation of this type of "luxury debt" alone can give this Court grounds for dismissal under both the "bad faith" and "totality of the circumstances" provisions of section 707(b)(3).  *See, e.g.*, *In re Honkomp*, 416 B.R. 647 (Bankr. N.D. Iowa 2009). Additionally, the fact that this debt was incurred, in the first place, only nine months prior to the petition date and at a time when Mr. McDowell was unemployed tends to indicate that the Debtors were making consumer purchases far in excess of their ability to repay.

Finally, the circumstances surrounding the filing of the initial petition and Schedules, and the subsequent amendments thereto, indicate that the Debtors have acted in bad faith.  The sheer number of amendments alone indicates that either the Debtors did not take care in the first instance to ensure the accuracy of their bankruptcy petition, Schedules, and SOFA, or that the Debtors thereafter made these amendments to account for increased income which they were required to report in order to convince this Court to vacate the dismissal order and grant them a discharge.

For all of the foregoing reasons, this Court concludes that the "totality of the circumstances . . . of the [Debtors'] financial situation demonstrates abuse[;]" thus, dismissal under section 707(b)(3)(B) is appropriate.    11 U.S.C.    707(b)(3)(B). Additionally, the Court finds that the Debtors filed their Chapter 7 petition in bad faith; thus, dismissal under section 707(b)(3)(A) is also warranted.

## V.    CONCLUSION

This Court is mindful of one of the central goals of the Code—to afford debtors a fresh financial start.  *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934).  However, an equally important goal is to provide for the fair and equitable treatment of creditors.  *See, e.g.*, *In re Ortiz*, No. 05-39982, 2006 Bankr. LEXIS 2797, at *27 (Bankr. S.D. Tex. Oct. 13, 2006) ("'[T]he laws and jurisprudence of bankruptcy note often that there are two competing goals of bankruptcy and reorganization.  One is the satisfaction of valid claims against the estate.  The other is to allow the debtor a 'fresh start' in the marketplace.'") (quoting *Fin. Sec. Assurance, Inc. v. T-H Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 188 B.R. 799, 807 (E.D. La. 1995), aff'd, 116 F.3d 790 (5th Cir. 1997)). Thus, "bankruptcy courts applying the totality of the circumstances test have observed that persons . . . with substantial and stable employment 'will be hard pressed to establish that they do not have the ability to pay some of their unsecured debt, such as through funding a . . . plan of reorganization.'"  *In re Camp*, 416 B.R. at 313 (quoting *In re Wadsworth*, 383 B.R. 330, 333–34 (Bankr. N.D. Ohio 2007)).  Here, the Debtors are both gainfully employed and have the ability to pay back at least some of their unsecured debt, particularly if they eliminate or at least reduce some of their unnecessary expenses.  Thus,

28

the totality of the circumstances demonstrates abuse, which in turn means that this Court will grant the Motion pursuant to section 707(b)(3)(B).

Additionally, because the Debtors:  (1) amended their Schedules only after the UST had brought to the Court's attention the inconsistencies between the representations made in the original Schedules and the Debtors' testimony at their meeting of creditors; (2) amended their Schedules to fabricate an argument that their debts are primarily business debts; and (3) amended their expenses to reflect a substantial increase in an effort to defeat the means test, this Court also concludes that pursuant to section 707(b)(3)(A), this case should be dismissed due to the Debtors' bad faith.

An Order consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

Signed on this 14th day of February, 2013.

Jeff Bohm
Chief United States Bankruptcy Judge